McMILLAN, Judge.
 

 The appellant, Kerry Spencer, was convicted of four counts of capital murder for his involvement in the shootings of four Birmingham police officers. In case no. CC-04-4129, Spencer was convicted of intentionally causing the death of Carlos Owen by shooting him with a firearm while Owen was on duty as a police officer, a violation of § 13A-5-40(a)(5), Ala.Code 1975. In case no. CC-04-4130, Spencer was convicted of intentionally causing the death of Harley A. Chisolm III, by shooting him with a firearm while Chisolm was on duty as a police officer, a violation of § 13A-5-40(a)(5), Ala.Code 1975. In case no. CC-04-4131, Spencer was convicted of intentionally causing the death of Charles R. Bennett by shooting him with a firearm while Bennett was on duty as a police officer, a violation of § 13A-5-40(a)(5), Ala.Code 1975. In case no. CC-04-4383, Spencer was convicted of intentionally causing the death of Carlos Owen, Harley A. Chisolm III, and Charles R. Bennett by one act or pursuant to one scheme or course of conduct by shooting them with a firearm, a violation of § 13A-5^40(a)(10), AJa.Code 1975. Finally, in case no. CC-04-4132, Spencer was convicted of intentionally attempting to cause the death of Michael Collins by shooting at him with a firearm, a violation of §§ 13A-6-2 and 13A-4-2, Ala.Code 1975.
 

 The penalty phase of the trial was conducted before the jury. In CC-04-4129, the jury recommended, by a vote of 9 to 3, that Spencer be sentenced to life imprisonment without the possibility of parole; in
 
 *220
 
 CC-04-4130, the jury recommended, by a vote of 10 to 2, that Spencer be sentenced to life imprisonment without parole; in CC-04-41S1, the jury recommended, by a vote of 9 to 3, that Spencer be sentenced to life imprisonment without parole; and in CC-04-4383, the jury recommended, by a vote of 7 to 5, that Spencer be sentenced to life imprisonment without parole. On September 9, 2005, the trial court held the final sentencing hearing. On September 23, 2005, the trial court overrode the jury’s recommendations and instead sentenced Spencer to death for the capital-murder convictions (CC-04-4129, CC-04-4130, CC-04-4131, and CC-04-4833); the trial court sentenced Spencer to life imprisonment for the attempted-murder conviction in case no. CC-04-4132. On October 5, 2005, Spencer filed a motion for a new trial. Spencer also filed a motion for reconsideration of the sentences and an amended motion for reconsideration of the sentences. On October 9, 2005, the trial court issued an amended sentencing order. On October 20, 2005, the trial court held a hearing on Spencer’s motion for a new trial and denied that motion and Spencer’s motion for reconsideration of his sentences and amended motion for reconsideration of his sentences that day. This appeal, which is automatic when a defendant has been sentenced to death, followed. See § 13A-5-53(a), Ala.Code 1975.
 
 [1]
 

 The evidence adduced at trial indicated the following: On July 17, 2004, Officers Carlos Owen, Harley A. Chisolm III, and Charles R. Bennett, of the Birmingham Police Department, were shot and killed, and a fourth officer, Officer Michael Collins, also of the Birmingham Police Department, was shot but survived. Officer Collins testified that while on patrol that morning, he heard a radio transmission from Officer Owen indicating that Officer Owen was getting out of his police vehicle at the 1600 block of 18th Street in Ensley to investigate something suspicious or a miscellaneous complaint. Officer Collins stated that he was familiar with the area so he proceeded to that location to back up Officer Owen. Officer Collins testified that when he arrived, he saw Officer Owen standing at the screen door of an apartment speaking with a black male, so he got out of his vehicle and began to approach the apartment.
 
 [2]
 
 According to Officer Collins, the man was belligerent, yelling ‘“Fuck the police.’” (R. 706.) Officer Collins stated that the individual told Officer Owen, “ ‘[Y]ou hide behind that badge and gun. I’ll fuck you up. Take that badge and gun off, I’ll fuck you up.’ ” (R. 709.) Officer Owen removed his badge and a female neighbor standing nearby called Officer Owen by his nickname, “Curly,” at which time Officer Owen put his badge back on, put his arm around the female and then the two officers walked back toward their automobiles. Carolyn Slaughter testified that she lived in the apartment complex at the time of the shootings. Slaughter stated that she walked outside and saw Officer Owen talking to Nathaniel “Nate” Woods; according to Slaughter, she heard Nate tell Curly to “ ‘[t]ake off that mother fucking badge and that gun and I will whoop your mother fucking ass.’ ” (R. 968.) Slaughter testified that Officer Owens removed his badge, but put it back on when she walked over to him and had a conversation with him. According to Slaughter, Nate told
 
 *221
 
 Officer Owens to get a warrant, and Officer Owens responded that the narcotics task force would be back.
 

 Officer Collins testified that as they walked back to their automobiles, Officer Chisolm arrived and got out of his automobile. According to Officer Collins, he and Officer Owen were informing Officer Chi-solm of the series of events that had transpired and someone inside the residence continued yelling, “Fuck the police.” (R. 710.) Officer Owen informed Officer Collins that the man at the doorway was Nathaniel Woods.
 
 [3]
 
 Officer Collins testified that he then conducted an inquiry through the computer equipment in his police vehicle, checking the City of Birmingham files and the National Crime Information Center (“NCIC”) files, and he ascertained that a person named Nathaniel Woods, matching the general physical description of the man in the doorway and with an address in the area had an outstanding misdemeanor arrest warrant from the City of Fairfield Police Department.
 

 Jacqueline Buchanan testified that she was a public safety dispatcher with the City of Fairfield. According to Buchanan, she confirmed for the Birmingham Police Department’s dispatcher that Fairfield had an outstanding arrest warrant for Nathaniel Woods. Vicky Young, a dispatcher with the Birmingham Police Department, testified that she informed Officer Chisolm over the radio that the warrant was still outstanding. Officer Collins testified that after receiving confirmation that the warrant was valid, he and Officers Owen, Bennett, and Chisolm returned to the apartment to serve the arrest warrant on Woods. According to Officer Collins, Officer Owen and he went to the rear of the apartment and Officers Bennett and Chi-solm went to the front of the apartment. He stated that when they arrived, he saw one individual run back inside the apartment and that Woods was standing at the screen door. Officer Collins testified that, as he and Officer Owen walked toward the back door, a man who was working on an automobile parked near the apartment got up and walked away, saying, ‘“I don’t want no part of this.’ ” (R. 727.) Officers Owen and Collins approached the screen door where Woods was standing, and Officer Owen told Woods that they had an outstanding warrant for his arrest from the Fairfield Police Department, and that Woods began cursing them, saying, “ ‘Fuck you. I don’t have no warrant. I ain’t got no papers on me. Fuck you.’ ” (R. 728.) and “Fuck you. Show me the papers.” (R. 803.) Officer Collins testified that they radioed Officer Chisolm and asked that he come to the back of the apartment to show Woods the printout of the NCIC information and the photograph of Woods from the files.
 

 According to Officer Collins, Officer Chi-solm came to the back of the apartment and, while he was showing Woods the printout and photograph, told him that the arrest warrant from Fairfield was for assault, at which time Woods again cursed the officers and then turned and ran back inside the apartment. Officer Collins testified that Officer Chisolm pursued Woods into the apartment. Officer Owen followed Officer Chisolm into the apartment, with Officer Collins following Officer Owen. Officer Collins testified that when he reached the kitchen, he saw Officer Chisolm holding Woods on the ground as if he were
 
 *222
 
 about to place Woods in handcuffs, and Officer Owen backed away a bit “like he had him and it was over.” (R. 733.) Officer Collins stated that he heard Woods yell, “‘I give up. I give up. Just don’t spray me with that mace.’ ” (R. 733.) He stated that he then heard a radio transmission from Officer Bennett that “ ‘[t]hey are coming out the front.’ ” (R. 733.) Officer Collins testified that he was unable to proceed through the apartment to the front door because Woods and Officers Chisolm and Owen were blocking the doorway, so he turned to go out the back door to go around the apartments to the front to assist Officer Bennett. According to Officer Collins, none of the officers had their weapons drawn when they entered the apartment, and he did not see any of the officers draw their weapons while he was inside the apartment.
 

 According to Officer Collins, as he got to the back door, he heard the shooting begin inside the apartment and then felt a slap on his side and on his pistol which was holstered. He stated that he was stunned, and that he radioed a “shots fired” call over the police radio, and ran to the back of his police car. Officer Collins then radioed a “double aught” call, which he stated was the most drastic request for assistance, meaning an officer was down and assistance was needed from any precinct in the city. Officer Collins testified that he heard additional gunfire as he was taking cover behind his automobile and that bullets were striking his vehicle. He stated that he looked at the doorway of the apartment and saw a man standing just outside the apartment and firing a gun in his direction. Officer Collins stated that his holster was damaged during the shooting, that he had a hole in his pants, that he sustained a wound in his leg, and that he later found a metal fragment in his pants pocket. Officer Collins identified Spencer in court as the man he saw standing outside the apartment shooting at him.
 

 Carolyn Lavender, a sergeant in the communications section of the Birmingham Police Department, testified about assorted radio transmissions between officers and dispatchers on the day of the shootings. Sgt. Lavender testified that a police dispatcher contacted Officer Chisolm at 1:17 p.m., and notified him that the arrest warrant on Woods had been confirmed by the Fairfield Police Department. Sgt. Lavender testified that the radio dispatch tape indicated that at 1:24:34 p.m. an unidentified officer at the scene stated, “ ‘They’re going out the front’ ” (R. 1088.) She further testified that two seconds later, at 1:24:36 p.m., a call of ‘“[sjhots fired’ ” was made, and a second “ ‘[sjhots fired’ ” transmission was made four seconds after the first, at 1:24:40 p.m.; and that at 1:25:20 p.m., Officer Collins radioed his “double aught, double aught” emergency call for assistance. (R. 1088-89.)
 

 Several of the officers who responded to the double-aught call testified at trial. Officer Hugh Butler testified that he arrived at the scene and saw another officer in position at the front door of the apartment, so he approached the door as well; according to Officer Butler, as he walked toward the front door, he saw Officer Bennett lying on the ground, stating, “I looked down and saw his eyes wide open, his pupils were blown and he had a hole in his face with a little bit of smoke coming out of it.” (R. 850.) He stated that he and other officers entered the front door of the apartment and that he saw Officers Owen and Chisolm lying on the floor “pretty obviously dead.” (R. 862.) Officers discovered an SKS assault rifle outside the front door of the apartment, and a number of weapons in plain view in assorted rooms of the apartment. Officer Fred Alexander arrived in the front of the apartment and
 
 *223
 
 radioed that there was an officer down in the front of the apartment and then made an additional radio transmission, indicating that two more officers were down inside the apartment. The officers checked the apartment to ensure that no one else was present and then established a perimeter around the apartment to begin searching the area for the suspects and to preserve the scene for evidence technicians. Officer Terrance Hardin testified that before entering the apartment, he secured the SKS assault rifle in a patrol car and then joined the other officers in entering the apartment. Ruben C. Parker, a sergeant with the Birmingham Police Department at the time of the shootings, testified that when he arrived at the scene, he saw Officer Bennett’s service revolver on the ground approximately 6 to 12 inches from Officer Bennett’s right hand, that another officer picked the weapon up from the ground and handed it to him, and that he kept the weapon in his custody until turning it over to evidence technician Chester White at the scene.
 

 A number of officers canvassed the neighborhood after failing to locate the suspects in their initial search of the apartment. Sgt. James Blanton testified that he led one team of officers in a search of one side of the block while another team of officers searched the other side of the block. After searching some of the houses, his team was informed that the other search party had encountered one of the suspects, so his team went to that residence to assist. Sgt. Blanton testified that the suspect, who was discovered in the attic of the residence, was taken into custody. Sgt. Blanton identified Spencer in court as the suspect taken into custody.
 

 Travis Dumas testified that he lived at the apartment with “Nate” Woods, “Nock” Spencer, and Fernando “Blue” Belser at the time of the shooting. (R. 897.) According to Dumas, he had stayed there for approximately 18 or 19 days, and that, although he saw officers patrolling the area, the morning of the shootings was the first time he saw officers actually come to the apartment. Dumas stated that Belser was the “doorman” and that he was the “assistant doorman” in that they answered the back door for people who came to the house to buy drugs; they would take the money from the individual and turn it over to Woods or Spencer; Woods or Spencer would then hand them the drugs; and they would in turn hand the drugs to the customer. Dumas stated that Nate, Nook, Blue, three females, and he spent the night in the apartment on the night before the shootings, and that he slept on the sofa. Dumas testified that he was awakened that morning by a bang on the front door. According to Dumas, Woods went to the front door and began arguing with police officers at the door. Dumas stated that more officers were at the back door. According to Dumas, at some point he heard Spencer yelling at the officers as well, and he heard an officer say that the officers would “be back.” (R. 912.) Dumas testified that after the officers left he heard Spencer say that if the officers returned he was going to “bust 'em,” which he interpreted to mean that Spencer was going to shoot the officers. (R. 913.) Dumas stated that he did not think Spencer was serious; Dumas further admitted that he had ingested narcotics the night before the shootings. Dumas identified the SKS assault rifle as the weapon Spencer had purchased on the night before the shootings. According to Dumas, Spencer fired the weapon on the night before the shootings and essentially kept it in his possession from the time he purchased it until the shootings the following day. Dumas testified that, after the officers left, he went back to sleep until he was awakened later, at which time he got up, washed his face,
 
 *224
 
 and then left the apartment to walk to the store a few blocks away. According to Dumas, when he began walking back to the apartment, he saw a large number of police officers, so he continued walking to a different location.
 

 Evidence technicians and a crime-scene investigator photographed and diagramed the scene and collected evidence in the area. In addition to the plethora of guns and unspent and spent ammunition discovered in and outside the apartment where the shootings occurred, the testimony indicated that Officer Owen’s holster was damaged and that his service handgun was not located in the vicinity of his body. Officer Cedric Clifton of the Birmingham Police Department testified that he located additional evidence in the residence where Spencer was taken into custody. Specifically, Officer Clifton testified that he discovered a 9mm Luger High Point brand handgun in the attic where Spencer was found, a 9mm Beretta brand handgun hidden behind the heater in the middle bedroom of the residence, and assorted rounds of ammunition in the residence. Officer Clifton stated that the 9mm Beretta handgun was damaged. Additional testimony indicated that the 9mm Beretta handgun found behind the heater in the residence where Spencer was arrested was Officer Owen’s service weapon. Officer Chisolm’s service weapon was discovered near his body and his can of Mace was discovered on the floor near the wall of the kitchen. A spent bullet was found a few inches in the ground beneath Officer Bennett’s head.
 

 Dr. Gary Simmons, a forensic pathologist with the Jefferson County coroner’s office, testified that he performed the autopsies on all three officers and concluded that each had died of multiple gunshot wounds. Dr. Simmons testified that stippling on Officer Chisolm’s face indicated that at least one of the bullets had been fired from close range. He stated that, in addition to wounds resulting from gunshots that grazed but did not penetrate deeply into his body, Officer Chisolm suffered multiple gunshot wounds to his back and side, and a number of those bullets traveled through and exited his body. Dr. Simmons further testified that Officer Owen did not exhibit signs of stippling. He stated that Officer Owen sustained grazing gunshot wounds and a number of entrance and exit wounds associated with multiple gunshot wounds to his back and arm. Dr. Simmons testified that Officer Bennett exhibited signs of soot and stippling to his skin, which indicated that one of the bullets was fired at close range to his face. He stated that Officer Bennett sustained a very close-range gunshot wound below his left eye, which passed through his brain case and portions of the brain before exiting though the back of his skull; he further testified that Officer Bennett sustained a gunshot wound to his chest that lacerated his heart and impacted his liver, esophagus, aorta, right adrenal gland, and spine but did not exit his body, and entrance and exit wounds on his arm associated with a third gunshot.
 

 Mitch Rector, a firearm and toolmark examiner with the Birmingham Police Department, testified that he examined the recovered weapons, bullet fragments, and shell casings associated with this case. According to Rector, a number of fragments recovered during the autopsies of Officers Bennett and Chisolm were fired from the SKS assault rifle; he stated that he conducted a distance study and concluded that the end of the barrel of the SKS assault rifle had been positioned from two to six inches from Officer Bennett’s face when that shot was fired. He further testified that although fragments recovered during the autopsy of Officer Owen exhibited characteristics similar to those
 
 *225
 
 fired from the SKS assault rifle, he could not conclusively state that those fragments were from the SKS assault rifle. Rector further testified that the damage to Officer Owen’s service weapon and holster was consistent with having occurred while the service weapon was in the holster, and that he recovered a bullet fragment from the holster that was consistent with having been fired from a rifle.
 

 Officer Jody Jacobs of the Birmingham Police Department testified that he interviewed Spencer at the police station after Spencer was taken into custody. According to Officer Jacobs, after he advised Spencer of his Miranda
 
 [4]
 
 rights, Spencer agreed to speak with officers. Spencer initially denied being at the residence and any involvement in the shootings, claiming that he hid in the attic after hearing that officers were searching the neighborhood because he had two outstanding warrants and did not want to go to jail. After officers informed Spencer that they had eyewitnesses who identified him as the gunman, Spencer stated that Curly and other officers came to the apartment early that morning and that Curly had taken off his badge and talked about fighting before leaving. Spencer then said he had his “AK” and that the officers came into the apartment with their guns for no reason spraying Mace, so he shot everyone who was pointing a gun at him. He stated that he went to the front door and saw an officer standing there, so he shot him as well. He went to the back door and saw an officer at a police car, so he fired additional shots and then fled through the front door. He stated that Curly was always harassing them. He stated that he was “pissed off’ with the officers’ harassment and “high” on cocaine. He conceded that he had fired his assault rifle the night before. He further stated that Curly had tried to push his way into the apartment window on a previous occasion but that Nate had grabbed a videocassette recorder and videotaped the incident, startling Curly and forcing him to leave.
 

 Spencer presented a number of witnesses at trial. Randall Washington testified that he was working on Courtney Spencer’s automobile in front of the apartment at the time the officers arrived. According to Washington, he saw the officers pull up and approach the apartment, but he denied speaking to them, saying that he stayed quiet because there was a warrant for his arrest. Washington stated that someone inside the apartment and some of the officers engaged in a conversation at the back door of the apartment, that Officer Owen said that they had a warrant, and that he heard someone inside the apartment tell the officers they could not come in without a warrant; he further testified that another officer came from the front to the back door and snatched the door open without saying anything about having a warrant, and the officers then proceeded inside. Washington testified that a minute or two later he heard gunfire from inside the apartment and that he remained hidden under the automobile until the gunfire subsided, at which time he fled on foot.
 

 Markesha Williams testified that she had been at the apartment the night before the shootings and both times the officers came to the apartment on the day of the shootings. She stated that that morning one of the officer’s took off his badge and tried to get Spencer to come outside, but that Spencer said the police could not get him outside in that manner. She said that she left for a few minutes after the officers left the first time, and that she was at the apartment and saw the officers ar
 
 *226
 
 rive the second time. According to Williams, Nate and she were sitting on the back porch, and they walked back inside when the officers arrived the second time. She said Spencer was still asleep when Nate first began talking with the officers at the back door. According to Williams, Spencer had a big gun that he had been carrying that day and the gun was near him while he slept. She stated that she next saw the officers take Nate down inside the kitchen and that she got up and went into the bathroom. Williams testified that she looked and saw Nate in the doorway. According to Williams, Spencer jumped up, looked out the bedroom window and then came out of the bedroom and peeked around the corner to see what was taking place. She stated that she heard Spencer say ‘What y’all doing?” and then she heard two gunshots. (R. 1619.) Williams testified that she then saw an officer come in with his gun out and she heard a third gunshot. Williams stated that she went out the front door and walked to the barber shop across the street. She stated on cross-examination that, after the officers left the first time that morning, she heard Nate and Spencer commenting that “they was gonna get” the officers if they returned, but she took their comments as “joking” and believed that “[tjhey wasn’t serious.” (R. 1638.)
 

 Spencer testified that he sold drugs from the apartment where the shootings occurred. He testified that he kept guns at the apartment, and that he had purchased the SKS assault rifle the night before the shootings and had test-fired it in the backyard. He stated that shortly after he test-fired the weapon, there was a disturbance involving some women, so he got the SKS and fired it into the air a number of times to break up the dispute. Spencer stated that although they sold approximately $3,000 in drugs from the residence on a daily basis, they had never had problems with the police. Spencer testified that Curly had attempted to force his way into the apartment through a window approximately eight months before the shootings, but that Nate had gotten his videocassette recorder and filmed the incident, startling Curly and causing him to jump back and leave.
 

 According to Spencer, sometime between 6:00 a.m. and 8:00 a.m. on the morning of the shootings, he was awakened by someone kicking on the front door; he stated that the sound was different than when customers knocked on the door and that their business was always conducted at the back door, so he immediately knew it was not related to his drug business. Spencer testified that Nate went to the front door and engaged in a discussion with an officer. According to Spencer, he looked out the window and saw Curly. Spencer testified that after the initial incident with the police on the morning of the shootings, Nate and he went to get some food. Spencer stated that sometime after they got back to the apartment, Curly returned alone and got into an argument with Nate at the back door, accusing them of stealing cars. Spencer stated that he went to the window and that Nate and he were both cursing at Curly, telling him to leave; according to Spencer, after he said a few curse words to Curly, Curly told him, “Yeah, there’s enough body bags for you too.” (R. 1658.) Spencer further testified that Curly stated, “I wish I had a reason to come in this apartment, I’d show you who was weak;” “Y’all so damn bad, bring your asses out if you so tough;” and “We gonna get you and when we get you, we’re gonna fuck you up.” (R. 1658-59.) Spencer testified that in response to that statement, Nate told Curly that he had no reason to be at the apartment and for him to “get the fuck on off the property.” (R. 1659.) Spencer testified that they contin
 
 *227
 
 ued cursing at each other and that Curly-said, “Don’t let me find a reason to come in this apartment.” (R. 1659.) According to Spencer, Officer Collins arrived on the scene at that time and parked behind Curly’s automobile, and Curly walked back to his car. Spencer further testified that Curly initially said he’d be back with the narcotics unit, but then said, “Nah, I’ll be back when I get off work.” (R. 1669.) Spencer stated that Curly again approached the door and Nate commented that Curly was hiding behind his badge. According to Spencer, Curly took off his badge and told them to come out, to which Nate responded that they were not stupid, at which time Carolyn Slaughter walked over to Curly and intervened, telling Curly to stop acting like that and to put his badge back on. Spencer stated that Curly put his badge back on his uniform and that Curly and Officer Collins drove away in their vehicles.
 

 Spencer testified that after he watched Curly and Officer Collins drive off, he noticed Nate talking to Officer Chisolm, who he knew as “Robo.” Spencer stated that he joined the argument and cursed at Officer Chisolm and told him to leave. He testified that Officer Chisolm made threatening statements to him that put him in fear for his life and made him believe the police would be back and that he “would be a dead man by [Officer Chisolm].” (R. 1667.)
 

 Spencer testified that he told Nate they could not sell any drugs that day because of the increased scrutiny from the officers. Spencer stated that they were going to wait until the police shift changed at 3:00 p.m., and then slip out of the apartment at that time to avoid encountering the officers that day. According to Spencer, he dozed off for some time and Nate likely went outside and “messed with his radio for awhile.” (R. 1672.) Spencer testified that he carried his SKS assault rifle with him and put it beside his leg when he took a nap. Spencer stated that shortly after 10:00 a.m. that morning, he took a Seroqu-el tablet and drank a beer to help him sleep.
 

 Spencer stated that he was awakened from his nap by a commotion in the back of the apartment, so he looked out the front bedroom window and saw that the police had returned. Spencer testified that he came out of the bedroom with the SKS assault rifle in his hands and encountered Nate coming toward him, holding his face as if he were in pain. According to Spencer, he heard something behind him, so he turned, saw someone he later stated he believed to be Officer Chisolm with his gun, and “automatically opened fire.” (R. 1681) He stated that he turned to the front door and saw another officer, so he shot him as well. “It was a split second decision. It wasn’t like I had time to say, Oh, you fixing to shoot me. No. It was — he pulled his gun up and I already had the weapon in my hand, so I opened fire.” (R. 1682.) Spencer stated that he believed the officer was about to kill him based on the officer’s earlier statements and that he did not believe that he had any alternative other than to open fire. Spencer further stated that he did not stop shooting until the officers were down. According to Spencer, he went to the back door and saw a gun next to an officer on the ground so he picked the weapon up and put it in his pocket, because he did not know if the officer was dead and he did not want the officer to shoot him in the back. Spencer stated that he looked out the back door and saw Officer Collins at the back of the apartment with his gun drawn and that Officer Collins ran behind his police ear. Spencer testified that he waited until Officer Collins reached his car and then fired “a couple of rounds into his windshield” before turning and fleeing through the
 
 *228
 
 front door of the apartment. (R. 1687.) According to Spencer, he was cautious as he left the front of the apartment because he did not know if any officers were waiting for him; that he had the SKS in his hand pointed down at the ground; that as he was standing next to where Officer Bennett was lying on the ground, the officer’s hand “jumped and touched [him]” and he feed the SKS assault rifle in an “automatic reflex.” (R. 1689.) According to Spencer, he dropped the SKS assault rifle at that time and fled. Spencer stated that he did not intentionally kill any of the officers and that he feed because he believed he would be killed if he did not. He stated that he could have easily killed Officer Collins but did not perceive that officer to be a threat, so he instead allowed him to take cover behind his vehicle and then feed the shots in his direction to facilitate his escape. According to Spencer, Nate and he ran to the house where Spencer was ultimately arrested and watched television with the homeowner. Spencer stated that Nate told him at that time that he had been sprayed with Mace, and Spencer noticed a “big knot” on Nate’s forehead. (R. 1691.) Spencer testified that he hid in the attic and that he did not resist when the police discovered him.
 

 On appeal, Spencer raises a number of issues, several of which he did not first raise by timely objection in the trial court. However, because Spencer has been sentenced to death, the lack of an objection does not bar appellate review, because this Court must review these proceedings for plain error. Rule 45A, Ala.R.App.P., states:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 When discussing the application of the plain-error standard of review, this Court has stated:
 

 “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in
 
 United States v. Young,
 
 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See
 
 Ex parte Price,
 
 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999);
 
 Burgess v. State,
 
 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999);
 
 Johnson v. State,
 
 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
 

 Hall v. State,
 
 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001). Although the failure to object will not preclude our review, it will weigh against any claim of prejudice. See
 
 Dill v. State,
 
 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992).
 

 I.
 

 Spencer first argues that the trial court erroneously allowed evidence of collateral crimes and prior bad acts, without sua sponte giving a limiting instruction to the jury regarding the proper use of the now complained-of evidence. Specifically,
 
 *229
 
 Spencer contends that a limiting instruction was required as to evidence regarding his drug use and his alleged occupation as a prominent drug dealer, evidence that he had “no bond” arrest warrants outstanding against him, evidence that he was frequently seen carrying a firearm, evidence that he had been discharging a firearm the night before the officers’ shootings, and evidence that spent shell casings were discovered around the apartment, all of which he contends had no nexus to the officers’ shootings.
 

 Spencer concedes that much of the evidence was admitted without objection; that the defense also introduced evidence and argument regarding his possession of a firearm and that sales of illegal drugs took place at the apartment; and that much of the evidence was admissible at trial. Spencer bases his argument, however, in large part on the Alabama Supreme Court’s holding in
 
 Ex parte Minor,
 
 780 So.2d 796 (Ala.2000), which he characterizes as a case in which that Court came “close to establishing a per se claim of reversible error when a trial court did not give, sua sponte, a limiting instruction concerning the proper use of bad acts evidence introduced in a capital murder trial.” (Spencer’s brief at p. 41-42.) Spencer, citing
 
 Johnson v. State,
 
 [Ms. CR-99-1349, March 11, 2005] — So.3d — (Ala.Crim.App.2005), avers that “while
 
 Minor
 
 involved the use of prior convictions to impeach a defendant witness, its language was broader.” (Spencer’s brief at p. 42.)
 

 However, Spencer’s reliance on this Court’s opinion in
 
 Johnson
 
 is misplaced. In
 
 Johnson v. State,
 
 [Ms. 1041313, Oct. 6, 2006] — So.3d — (Ala.2006), the Alabama Supreme Court reversed the judgment of this Court, holding that there was a fundamental difference between prior convictions offered to impeach the defendant’s credibility and prior convictions and prior bad-act evidence offered as substantive evidence of the current crime for which the defendant was on trial, or evidence of permissible factors such as the defendant’s motive, state of mind, and intent.
 
 [5]
 
 In
 
 Snyder v. State,
 
 893 So.2d 482 (Ala.2001), and
 
 Ex parte Minor,
 
 780 So.2d 796 (Ala.2000), two cases that formed the basis of this Court’s opinion in
 
 Johnson,
 
 and in large part the crux of Spencer’s appellate argument, the evidence in question was evidence of prior convictions offered to impeach the defendant’s credibility. In
 
 Ex parte Johnson,
 
 however, the Alabama Supreme Court, in distinguishing the facts in
 
 Johnson
 
 from the facts in
 
 Snyder
 
 and
 
 Minor,
 
 stated:
 

 “It is contradictory and inconsistent to allow, on the one hand, evidence of Johnson’s prior bigamy conviction and prior bad acts as substantive evidence of the offense with which she was charged, yet, on the other hand, to require a limiting instruction instructing the jury that it cannot consider the evidence as substantive evidence that Johnson committed the charged offense. Other jurisdictions that have considered this issue have concluded that a limiting instruction is not required when evidence of other crimes or prior bad acts is properly admitted as part of the res gestae of the crime with which the defendant is charged. See
 
 People v. Coney,
 
 98 P.3d 930 (Colo.Ct.App.2004) (holding that evidence of other offenses or acts that are part and parcel of the charged offense is admissible as res gestae and may be admitted without a limiting instruction);
 
 State v. Long,
 
 173
 
 *230
 
 N.J. 138, 171, 801 A.2d 221, 242 (2002) (evidence of the defendant’s actions ‘served to paint a complete picture of the relevant criminal transaction’ and therefore was admissible, and a limiting instruction was unnecessary because the evidence was admitted under the res gestae exception); and
 
 Camacho v. State,
 
 864 S.W.2d 524, 535 (Tex.Crim.App.1993) (holding the evidence of the extraneous offenses showed the context in which the criminal act occurred, i.e., the res gestae, and was therefore admissible and not subject to the requirement of a limiting instruction).
 

 “Accordingly, we conclude that the trial court did not commit plain error in failing to give the jury a limiting instruction regarding its use of the evidence relating to Johnson’s prior bigamy conviction and her prior bad acts, including her adulterous relationships, sexual manipulations, and proddings, because that evidence, as discussed above, was properly admitted as substantive evidence of the offense with which Johnson was charged and was not offered for purposes of impeachment.”
 

 — So.3d at-.
 

 Here, the evidence Spencer contends required a limiting instruction was not evidence of prior
 
 convictions;
 
 further, the evidence was not offered to impeach Spencer’s credibility. Rather, the evidence was properly admitted for other reasons, including, but not limited to, evidence of his intent and motive. See, e.g.,
 
 Johnson v. State,
 
 supra (evidence of prior bigamy conviction and prior bad acts including adultery and other sexually related activities was admissible as substantive evidence of the offense based on the facts of that case); and
 
 Turner v. State,
 
 924 So.2d 737 (Ala.Crim.App.2002) (no plain error where defendant was not cross-examined concerning any prior convictions; no evidence of prior convictions was admitted; and reference to outstanding warrants does not equate to evidence of a prior conviction.). Here, evidence that Spencer was engaged in a drug-dealing enterprise at the residence where the shootings occurred, evidence that Spencer was frequently seen in possession of a firearm at the residence, evidence that there had been a confrontation involving Spencer’s accomplice Woods and police officers earlier in the day of the shootings, and evidence that Spencer had outstanding warrants for his arrest were all properly admitted for reasons other than simple impeachment of Spencer’s credibility. Because the evidence was proper to establish factors such as motive and intent, we find no plain error in the trial court’s failure to sua sponte issue a limiting instruction as to the complained-of evidence.
 

 II.
 

 Spencer next argues that the trial court erroneously failed to instruct the jury on voluntary intoxication and the lesser-included offense of manslaughter. Spencer concedes that, although he requested an instruction on voluntary intoxication, he did not object to the lack of the now requested instructions. Thus, the plain-error doctrine applies.
 

 “ ‘ “In setting out the standard for plain error review of jury instructions, the court in
 
 United States v. Chandler,
 
 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited
 
 Boyde v. California,
 
 494 U.S. 370, 380 (1990), for the proposition that ‘an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.’
 
 Williams v. State,
 
 710 So.2d 1276, 1306 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).” ’
 

 
 *231
 

 “Broadnax v. State,
 
 825 So.2d 134, 196 (Ala.Crim.App.2000), quoting
 
 Pilley v. State,
 
 789 So.2d 870, 882-88 (Ala.Crim.App.1998). Moreover, ‘[w]hen reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them.
 
 Ingram v. State,
 
 779 So.2d 1225 (Ala.Cr.App.1999).’ ”
 
 Johnson v. State,
 
 820 So.2d 842, 874 (Ala.Crim.App.2000).”
 

 Snyder v. State,
 
 893 So.2d 488, 548 (Ala.Crim.App.2003); see also
 
 Belisle v. State,
 
 11 So.3d 256, 308 (Ala.Crim.App.2007); and
 
 Harris v. State, 2
 
 So.3d 880, 910 (Ala.Crim.App.2007).
 

 Generally, where there is evidence of intoxication and the charged offense involves specific intent, such as capital murder, the trial court should instruct the jury on the lesser-included offense of manslaughter. See
 
 Pilley v. State,
 
 930 So.2d 550, 562 (Ala.Crim.App.2005).
 

 “ A charge on intoxication should be given if “ ‘there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt’ ” in the element of intent.
 
 Coon v. State,
 
 494 So.2d 184, 187 (Ala.Crim.App.1986) (quoting
 
 Government of the Virgin Islands v. Carmona,
 
 422 F.2d 95, 99 n. 6 (3d Cir.1970)). See also
 
 People v. Perry,
 
 61 N.Y.2d 849, 473 N.Y.S.2d 966, 966-67, 462 N.E.2d 143, 143-44 (App.1984) (“[a] charge on intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis”). An accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is conflicting,
 
 Owen v. State,
 
 611 So.2d 1126, 1128 (Ala.Crim.App.1992);
 
 Crosslin v. State,
 
 446 So.2d 675, 682 (Ala.Crim. App.1983), where the defendant denies the commission of the crime,
 
 Coon v. State,
 
 494 So.2d at 187; see
 
 Moran v. State,
 
 34 Ala.App. 238, 240, 39 So.2d 419, 421, cert. denied, 252 Ala. 60, 39 So.2d 421 (1949), and where the evidence of intoxication is offered by the State, see
 
 Owen v. State,
 
 611 So.2d at 1127-28.’
 

 “Pilley v. State,
 
 930 So.2d 550, 561-62 (Ala.Crim.App.2005).
 

 “However, the court should charge on voluntary intoxication only when there is a sufficient evidentiary foundation in the record for a jury to entertain a reasonable doubt as to the element of intent.
 
 Ex parte McWhorter,
 
 781 So.2d 330, 342 (Ala.2000). In
 
 Pilley
 
 this Court provided guidance as to what evidence would be required to form that evidentiary foundation.
 

 “ ‘The Alabama Legislature has defined “intoxication” to include “a disturbance of mental or physical capacities resulting from the introduction of any substance into the body.” § 13A-3-2(c)(l), Ala.Code 1975. Thus, evidence that the defendant ingested alcohol or drugs, standing alone, does not warrant a charge on intoxication. “[T]here must be evidence that the ingestion caused a disturbance of the person’s mental or physical capacities and that that mental or physical disturbance existed at the time the offense was committed.”
 
 Lee v. State,
 
 898 So.2d 790, 838 (Ala.Crim.App.2001) (opinion on return to remand), cert. denied, 898 So.2d 874 (Ala.), cert. denied, 543 U.S. 924, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004). See also
 
 Maples v. State,
 
 758 So.2d 1, 23 (Ala.CrimApp.), aff'd 758 So.2d 81 (Ala.1999). Such a holding is consistent with this Court’s opinion in
 
 Windsor v. State,
 
 683 So.2d 1027, 1037 (Ala.
 
 *232
 
 Crim.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), in which we stated:
 

 “ ‘ “In this case, however, there was no evidence that the appellant was intoxicated. Although there was evidence that the appellant had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated. There was no ‘reasonable theory
 
 [1]
 
 to support an instruction on intoxication because there was no evidence of intoxication. The court did not err in not instructing the jury on intoxication and manslaughter where there was no evidence that the appellant was intoxicated at the time the robbery-murder occurred.” ’
 

 “Pilley,
 
 930 So.2d at 563.”
 

 Harris v. State,
 
 2 So.3d at 911. Thus, “‘[ujnder § 13A-l-9(b), Ala.Code 1975, a trial judge is not required to instruct on a lesser-included offense “unless there is a rational basis for a verdict convicting the defendant of the included offense.” ’ ”
 
 Harris,
 
 2 So.3d at 912, quoting
 
 Pilley,
 
 930 So.2d at 563.
 

 Here, Spencer presented evidence indicating that he had ingested narcotics and alcohol the night before the shootings and the morning of the shootings. Spencer testified that at the time of the shootings, he had a cocaine habit of “about six to seven grams a day.” (R. 1647.) When asked whether he had taken any narcotics on the morning of the shootings, Spencer stated:
 

 “Yes, I did. You know, I had a little bit of [cocaine] powder left over from the night before. But the night before, we really did a lot of cocaine. And, you know, I probably didn’t go to sleep until about 4 in the morning, you know, just dozed off.”
 

 (R. 1675-76.) Spencer further stated that sometime shortly after 9:00 a.m. on the morning of the shootings, he took a Se-roquel tablet and drank a beer to help him go to sleep. (R. 1676.) Finally, in an interview with the police after his arrest, Spencer stated that he was “high” at the time of his arrest. However, this evidence alone does not constitute evidence indicating that Spencer was intoxicated at the time of the shootings. Spencer did not claim to be intoxicated at the time of the shootings. There was no evidence concerning the effects, if any, that the amounts of cocaine and other substances allegedly ingested the night before and morning of the shootings had on Spencer at the time of the shootings. Rather, based on the evidence presented at trial, Spencer failed to establish any evidentiary foundation of intoxication that would warrant an instruction on intoxication. There was simply insufficient evidence from which a jury could have found beyond a reasonable doubt that Spencer was unable to form the requisite intent to commit capital murder, because he was experiencing “a disturbance of mental or physical capacities,” resulting from drug or alcohol use at the time of the murders. Because there was no rational basis for an instruction on voluntary intoxication, we find no plain error in the trial court’s failure to instruct the jury on voluntary intoxication or reckless manslaughter as a lesser-included offense.
 

 III.
 

 Spencer next argues that the trial court erred in not issuing an instanter subpoena to compel the presence of defense witness Tyran “Bubba” Cooper.
 

 
 *233
 
 It is well settled that the Sixth Amendment of the United States Constitution and Art. I, § 6, Alabama Constitution of 1901, affords, in pertinent part, an accused the right “to have compulsory process for obtaining witnesses in his favor.” However, in
 
 Smith v. State,
 
 698 So.2d 189 (Ala.Crim.App.1996), this Court stated:
 

 “To warrant a continuance on the ground that a witness is absent, it must be shown that the expected testimony of the witness is material and competent, that there is a probability that the evidence will be forthcoming if the case is continued, and that the moving party exercised due diligence to secure the evidence.
 
 Ex parte Saranthus,
 
 501 So.2d 1256 (Ala.1986). ... It must be shown that substantially favorable testimony would be given by the witness and that the denial of a continuance would materially prejudice the defendant.
 
 Whitehead v. State,
 
 429 So.2d 641 (Ala.Cr.App.1982). In addition, it must be established that the expected testimony is not merely cumulative or in the nature of impeachment, and the motion for a continuance must not be made merely for purposes of delay.
 
 Mitchell v. Moore,
 
 406 So.2d 347 (Ala.1981);
 
 Malone v. State,
 
 659 So.2d 1006 (Ala.Cr.App.1995);
 
 McClellan v. State,
 
 628 So.2d 1026 (Ala.Cr.App.1993);
 
 Prince v. State,
 
 623 So.2d 355 (Ala.Cr.App.1992).”
 

 698 So.2d at 205. Additionally, Rule 17.5, Ala.R.Crim.P., provides that “[a]ny witness who, after being subpoenaed, fails to appear at the time and the place as required by the subpoena, or who fails to remain until released, may be attached by order of the court.” In
 
 Weaver v. State,
 
 401 So.2d 344 (Ala.Crim.App.1981), this Court stated:
 

 “ ‘Before it can be said that the accused has been denied this constitutional right, he must apply to the court for the issuance of an attachment and show to the court that the witness has been served with a subpoena a sufficient length of time before the trial to afford an opportunity to the witness to obey its mandate, that the witness is within the jurisdiction of the court, and that his attendance can be obtained within a reasonable time by the compulsory process, that such -witness is absent without the procurement or consent of the accused, and that the testimony of the witness is material....”’
 

 401 So.2d at 349, quoting
 
 Thomas v. State,
 
 15 Ala.App. 408, 73 So. 558 (1916).
 

 Spencer relies in large part on
 
 McTerry v. State,
 
 680 So.2d 953 (Ala.Crim.App.1996), and
 
 Ervin v. State,
 
 584 So.2d 947 (Ala.Crim.App.1991). The State contends that the facts here are sufficiently different than those in
 
 McTerry
 
 and
 
 Ervin,
 
 and, therefore, that there is no error fatal to the convictions in the present case in not issuing an instanter subpoena to compel Cooper’s presence at trial. For the reasons that follow, we agree with the State.
 

 In
 
 Ervin,
 
 the circuit clerk failed to serve 23 defense subpoenas, an oversight that was discovered by defense counsel near the close of the State’s case. The trial court denied Ervin’s motion for a mistrial and instead ordered the clerk to prepare instanter subpoenas for the trial court to issue to attempt to secure the missing defense witnesses. At the close of the defense’s case, the defense renewed its motion for a mistrial on the grounds that two witnesses, both of whom were eyewitnesses to the shootings and further provided corroborating evidence supporting Er-vin’s claim that the shootings were in self-defense, were absent. The trial court overruled Ervin’s motion for a mistrial on the grounds that one witness’s current whereabouts were unknown and that Er-vin’s rights were not violated with regard to the second witness because Ervin had
 
 *234
 
 presented other evidence corroborating his claim that the shootings were in self-defense. In reversing the trial court’s decision, this Court stated:
 

 “The object of the constitutional guarantee of compulsory process is that the court will exercise its power to compel attendance of witnesses.
 
 Scott v. State,
 
 34 Ala.App. 519, 41 So.2d 630 (1949). The court must do all that the defendant calls upon it to do within the legal power of the court to obtain evidence under Article I, § 6.
 
 Parsons v. State,
 
 251 Ala. 467, 38 So.2d 209 (1948). The right to compulsory process is guaranteed by the constitution, and neither the legislature nor the courts can deprive a defendant of that right.
 
 Bush v. State,
 
 168 Ala. 77, 53 So. 266 (1910).”
 

 Ervin,
 
 584 So.2d at 949. This Court concluded that the circuit clerk had failed to perform its affirmative duty under § 12-21-244, Ala.Code 1975, to see that the defense’s requested subpoenas were issued before trial, and, thus, that the trial court had “to take all steps necessary to ensure the defendant’s constitutional guarantee of compulsory process.”
 
 Id.
 
 This Court concluded that by failing to attempt to serve the first witness, the trial court could not determine that witness’s whereabouts to be unknown or the witness to be outside of the court’s subpoena power; moreover, this Court further noted that because the two witnesses were allegedly eyewitnesses to the actual shootings and could each allegedly provide testimony corroborating Ervin’s self-defense claim, their testimony was not cumulative to other evidence because the jury could have found the missing witnesses to be more credible than the evidence presented at trial.
 

 In
 
 McTerry,
 
 Williams, the witness at issue had been subpoenaed by the State and was the only eyewitness to the shooting other than the victim. At a preliminary hearing Williams testified that he could not positively identify the shooter. Williams reported to court on the day of trial but was excused by the State shortly before the trial commenced because, according to the prosecutor, his testimony was neutral in that he could not identify the gunman. The victim testified that the gunman, whom he identified as McTerry, was on foot at the time of the shootings; however, in the preliminary hearing, Williams had testified that the gunman was on a bicycle. McTerry requested a subpoena after the victim testified, contending that it had not previously subpoenaed Williams because Williams was already under subpoena by the State, and it did not anticipate any conflict between Williams’s expected testimony and the victim’s expected testimony. The trial court refused to issue the subpoena. This Court stated:
 

 “A corollary to the accused’s right to compulsory process is the court’s obligation to ensure that that right is not violated for procedurally pretextual reasons. See
 
 Thomas v. State,
 
 15 Ala.App. 408, 409, 73 So. 558 (1916) (compulsory process ‘is a substantive right, a real right, and not an illusory sham to be satisfied by the issue of process, which is to be rendered ineffectual by hastening on to immediate trial’), and
 
 Walker v. State,
 
 117 Ala. 85, 88, 23 So. 670 (1898) (‘No convenience of the court, nor any condition of the docket of the cases for trial, can authorize the denial of [the right of the accused to compulsory process], guaranteed to him by the constitution of the State.’). The mandatoiy and comprehensive nature of the court’s obligation to the accused was illustrated in
 
 Ervin v. State,
 
 584 So.2d 947 (Ala.Cr.App.1991).”
 

 McTerry,
 
 680 So.2d at 955. This Court continued, stating:
 

 
 *235
 

 “We
 
 note that the court’s duty to issue subpoenas on an accused’s behalf does not require the court to grant a motion for a continuance or a motion for an attachment. The law is well-settled that a motion for a continuance, even when based on an absent witness, is addressed to the sound discretion of the trial court.
 
 Pritchett v. State,
 
 445 So.2d 984 (Ala.Cr.App.1984). See Rule 17.5, Ala.R.Crim. P., (‘[a]ny witness who, after being subpoenaed, fails to appear ... may be attached by order of the court’) and § 12-21-182(a) (‘the attendance of such witness may be compelled by attachment’).
 

 “The state contends that the appellant’s motion for a subpoena amounted to a motion for a continuance. However, this assertion is unsupported by the record. The appellant never indicated to the court that he would need additional time to locate Williams. Indeed, Williams had shown up for trial earlier that day, and there was no reason to believe he could not be found within a short time. At the time the subpoena was requested, two defense witnesses and two rebuttal witnesses for the state had yet to testify.”
 

 McTerry,
 
 680 So.2d at 956.
 

 In the present case, at approximately 4:45 p.m. on Saturday, June 19, 2005, during the defense’s case, the defense called Cooper as its final witness; however, he was not present. Outside the hearing of the jury, defense counsel informed the trial court that the witness had not been subpoenaed because the witness had told defense counsel “on three or four occasions he didn’t need a subpoena.” (R. 1719.) Defense counsel requested a continuance until 8:30 a.m. the following morning, and the trial court recessed until 8:30 a.m. the following morning.
 

 The following morning, defense counsel informed the trial court that Cooper was again not present. Defense counsel averred that a subpoena had been issued on May 17, 2005, to secure the presence of Cooper as a witness at trial. That subpoena was returned unserved on May 23, 2005, because Cooper had not been located. According to defense counsel, an alias was issued on May 25, 2005, but defense counsel was unaware as to whether that subpoena had been served. Defense counsel informed the trial court that he had spoken with Cooper on the telephone the day before; he stated that Cooper claimed to have been unaware that he was supposed to be in court and that Cooper wanted to speak with his attorney before agreeing to testify at Spencer’s trial. Defense counsel averred that members of Spencer’s family had spoken with Cooper that morning and provided the trial court with the address of the apartment where Cooper was supposedly located at that time; according to defense counsel, Cooper had informed the family members that he did not wish to testify at Spencer’s trial. The trial court instructed defense counsel to telephone Cooper at the number they had been given, but that number was the general office number for the apartment complex, rather than the specific apartment where Cooper was allegedly located.
 

 Defense counsel requested that the trial court issue an attachment to have Cooper picked up and brought to court. The trial court indicated that there was no information indicating that Cooper had ever been served with a subpoena. The following exchange then occurred:
 

 “[Defense, counsel]: Secondly, if not served, we would ask the Court to issue instanter subpoena since we know where he’s at and he’s a critical witness in this capital murder case.
 

 
 *236
 
 “That being said, we would expect if this man showed up to testify to some very important facts to this case, specifically as to why Carlos Owen and Harley Chisolm were going to the apartments on the numerous times on the date of the shootings. And specifically that Tyran Cooper was a drug supplier.
 

 “I think there has been testimony in court he was the drug supplier of this particular apartment complex of my client. And that he quit paying them. He was paying them a thousand dollars a week. He got in trouble in April of 2004 regarding attempted murder charges.
 

 “Thereafter they upped the price from a thousand dollars a week to fifteen hundred dollars a week. He, therefore, instead of staying in and around the apartments he was staying at, he started staying evidently in this Clay Chalkville area outside or in the East Lake area in order to avoid them. He would slip in whenever he could to supply the apartments with the drugs.
 

 “That in and of itself ties the rest of our case together, what we submit to the Court is part of the self-defense and the reason why they were there during the times and the reason they were making the statements they were to him.
 

 “THE COURT: Well, let me ask you a question. Does [Cooper] have pending criminal charges at this time?
 

 “[Defense counsel]: Yes, he has. It’s my understanding he has — some Hill.
 

 “[Assistant defense counsel]: There are three attempted murders.
 

 “[Defense counsel]: New Hill. Some kind of incident happened in New Hill in Birmingham or in the Bessemer District of Jefferson County.
 

 “He has three attempted-murder charges against him that are pending. It was originally set for trial on April 11, the same day this was to be tried, this particular case to be tried. It had been continued over.
 

 “THE COURT: Well, my point is he’s got a lawyer I guess on these pending charges.
 

 “[Defense counsel]: He does.
 

 “THE COURT: So even if you got him served and got him here, I would still have to have his lawyer here because the first thing I’m going to have to advise him of is his constitutional rights because apparently he’s the same Bubba that’s been referred to in these proceedings we’ve been trying this week as the supplier for the drugs that Mr. Spencer and Mr. Woods were dealing out of that apartment.
 

 “So do you really think once he talks to his lawyer that he is not going to invoke his Fifth Amendment privilege, especially in light of the fact he’s told you he wouldn’t come and has been apparently uncooperative? And secondly he’s your last witness. How long do you want me to sit around and wait on him— on some futile effort to try to get him here?
 

 “[Defense counsel]: He has indicated on numerous occasions he’s going to be here. The last occasion—
 

 “THE COURT: Well, he indicated yesterday or this morning he wasn’t coming, or whoever went by to get him.
 

 “[Defense counsel]: I can’t speak for what — he’s afraid of what may happen to him if he testifies. Obviously he’s afraid of the police.
 

 “THE COURT: Sure. That’s why he is going to take the Fifth Amendment. If he gets up and says, Yeah, I’m a dope dealer—
 

 “[Defense counsel]: He’s also kin to Nathaniel Woods. So he was going to
 
 *237
 
 do it because of the family. You know, he was going to take a hit.
 

 “THE COURT: What is it you are asking me to do? Put all of this on the record? What are you asking the Court to do?
 

 “[Defense counsel]: One, to make a determination if the last May 25 subpoena has been served at Pearson Hall. If that can’t be determined, I would ask the Court to issue an instanter subpoena to have him picked up today at this address that I have given you, 1016 Huffman Road, Birmingham.
 

 “THE COURT: Okay. So I issue an instanter subpoena, what are we going to do? Just sit around and wait?
 

 “[Defense counsel]: I guess so.
 

 “THE COURT: How long do you think I can sit around and wait?
 

 “[Defense counsel]: I think we need to make an attempt to see if he is there and see if he is going to come. If he is avoiding the service or avoiding the pick up, then I don’t know anything else the Court can do. But at least the one attempt and as crucial as this witness is, it’s important.
 

 “THE COURT: Well, let’s talk about that. You say he is crucial. I’m not sure that that testimony would be admissible anyway.
 

 “[Defense counsel]: Well, we think we’ve proven self-defense in our—
 

 “THE COURT: First of all, the officers are there on a lawful arrest warrant. So they are there in the house legally. So if they are there legally, what’s the relevance of that, even if he were to come in here and say that? Why would it be relevant?
 

 “[Defense counsel]: Well, even if you’re not trying to prove the truth of the matter of what they’re saying that he sold drugs or something, it would be to rebut the testimony of the State where they said that the officers were there earlier to check on the switched [automobile license] tags.
 

 “THE COURT: It doesn’t matter what they are there for earlier. If they are there checking the tags on the car, or they know it is a dope house there and they are checking on the activity going on there, they have a legal right to come up and knock on the door.
 

 “[Defense counsel]: I think we have a legal right to put on evidence of why they were there otherwise.
 

 “THE COURT: I disagree with you. I’m not going to issue an attachment for him because he’s not served. I don’t know what else to tell you. I’m not going to just stop with this being your last witness and sit around on something that may not even be admissible while some futile search is made for somebody who won’t cooperate, doesn’t want to be a witness, who’s got some criminal exposure and a lawyer that I can’t even track down. We’ve tried to track his lawyer down this morning and see if they might be able to help us. We can’t even get in touch with his lawyer. All of this should have been addressed long before we got to this point and worked out with his lawyer about whether he would testify. You know, most folks would have called his lawyer and said, ‘Look, I want to subpoena him. What is he going to do? Will he testify? What are you going to advise him to do?’
 

 “[Assistant defense counsel]: We would object to the Court—
 

 “THE COURT: If he is going to take the Fifth Amendment, I need to know that. If he is going to testify, I need to know. That’s why you deal with the witness’s lawyer rather than directly with him.
 

 
 *238
 
 “[Assistant defense counsel]: We would object to Court making the statement that he wasn’t served. We don’t know.
 

 “THE COURT: I don’t know that he was served.
 

 “[Assistant defense counsel]: Well, what I’m saying is through no fault of our own we are here on Sunday morning and the clerk’s office is obviously closed and we do not have access to the clerk’s office record to determine whether or not he was served.
 

 “THE COURT: We checked the computer and the computer doesn’t show him served.
 

 “[Defense counsel]: They don’t show either way on this one, Judge. One other thing to make it clear, is that despite this man having a lawyer he has contacted me by telephone and given me a statement as to what his involvement was.
 

 “THE COURT: I understand that he may have done that. My point being when it comes down to the liglag and it’s time for him to get on the witness stand, both you lawyers are experienced enough to know that he’s got a right to have his lawyer here, particularly in light of the evidence that he’s got some criminal exposure in relation to all this stuff and that you’ve got to work with the lawyer about whether he is going to testify. If the lawyer is going to advise him to take the Fifth Amendment, I can’t make him testify. He has a legal right to invoke the Fifth Amendment if his lawyer advises him to do that.
 

 “[Assistant defense counsel]: He’s got a lawyer in his attempted-murder case.
 

 “THE COURT: Don’t you think he might need a lawyer if they indict him and he gets up and testifies in regard to his criminal activity involved in that apartment out there and these two defendants?
 

 “[Assistant defense counsel]: He indicated to us he was going to testify.
 

 “THE COURT: That didn’t really answer my question. I can understand why you wouldn’t. I’ve got to make the call, I’m sorry, I’m not going to delay this trial — sit around here all day with the jury tied up back there with nothing else to do but sit in the jury room while some futile effort is made to locate a witness we all know is never going to testify. You can object [defense counsel], but quite frankly—
 

 “[Defense counsel]: I do object, for the record.
 

 “THE COURT: For the record you’ve got an exception.”
 

 (R. 1725-33.) The prosecutor later clarified, and defense counsel agreed, that Cooper was not expected to testify that he was present at the apartment when the shootings occurred or that he actually witnessed the shootings.
 
 [6]
 

 Clearly, the facts in this case differ from those in the authority on which Spencer relies, i.e.,
 
 Ervin
 
 and
 
 McTerry.
 
 In
 
 Ervin,
 
 the missing witnesses were not subpoenaed because the circuit clerk’s office failed to perform its affirmative duty; there is no such failure by the circuit clerk’s office here. Further, the missing witnesses in
 
 Ervin
 
 were both eyewitnesses to the shootings, and their respective testimony was expected to support Ervin’s claim that the shootings were in self-defense; here, defense counsel conceded that Cooper was not present at the time of the shootings. Similarly, the witness in
 
 *239
 

 McTerry
 
 was an eyewitness to the shooting. Further, the witness in
 
 McTerry
 
 actually appeared at the courthouse for trial in response to the subpoena issued by the State, and there were no reasons present in the record to indicate that he would not return to testify. Here, however, defense counsel conceded that there was conflicting information as to whether Cooper would testify at trial, particularly in light of pending criminal charges against him and the fact that his expected testimony could implicate him in additional criminal activity-
 

 Finally, in
 
 McTerry,
 
 this Court noted that the defense did not seek a continuance nor would an attempt to subpoena the witness necessarily result in any delay in the trial proceedings because there were two additional defense witnesses and two rebuttal witnesses for the State yet to testify and based on the witness’s aforementioned willingness to appear in court earlier that day; further, there were no indications that he could not be found quickly. Here, however, Spencer did not bring Cooper’s absence to the trial court’s attention until shortly before the close of the defense’s case. Thus, unlike the situation in
 
 McTerry,
 
 where the missing witness might have reasonably been located without causing
 
 any
 
 delay in trial, here, Cooper was to be Spencer’s final witness, and the State indicated that it had no rebuttal witnesses based on the testimony previously presented; thus, any efforts in locating Cooper would have delayed the trial proceedings. Thus, although Spencer may not have formally requested a continuance, the actions he sought the trial court to undertake, of necessity, were the functional equivalent of a continuance. Indeed, the trial court had already afforded Spencer some additional time by dismissing the jury for the evening the day before when the defense announced that its next witness, i.e., Cooper, was not present, and allowing Spencer until 8:30 the following morning to attempt to locate Cooper and secure his presence.
 

 Finally, as the trial court noted, there was some question as to whether the testimony, as proffered, would have even been admissible. The witness did not see the shootings; moreover, there was no indication that the witness was going to testify as to any specific communications between himself and the accused that would support a self-defense argument.
 

 Thus, contrary to Spencer’s assertion in his brief, the trial court did not fail in its “obligation to make an attempt to protect Spencer’s right to put on his defense.” (Spencer’s brief at p. 61.) Rather,-the trial court adequately protected Spencer’s rights, including granting Spencer an overnight continuance to the following morning, and then conducting a thorough discussion on the record as to the status of the defense’s efforts to locate the witness, the expected testimony of the witness, and the likelihood of the witness taking the stand if located. As noted above, ironically in one of the very cases relied upon by Spencer on appeal, “the court’s duty to issue subpoenas on an accused’s behalf does not require the court to grant a motion for a continuance or a motion for an attachment. The law is well-settled that a motion for a continuance, even when based on an absent witness, is addressed to the sound discretion of the trial court.”
 
 McTerry v. State,
 
 680 So.2d at 956. Here, because the witness’s absence was not due to any failure by the circuit clerk or authorities, because the proffered testimony was tenuous at best, because there is no reasonable assurance that the witness would have even testified if he was brought to court, and because any further efforts to locate the witness would have, of necessity, amounted to a continuance resulting in the delay of the trial proceed
 
 *240
 
 ings, we cannot say that Spencer was denied his constitutional right to compulsory process by the trial court’s rulings.
 

 IV.
 

 Spencer next argues that the trial court erred in refusing to instruct the jury on self-defense.
 

 At the time of the shootings, § 13A-3-28, Ala.Code 1975, provided:
 

 “(a) A person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for the purpose. A person may use deadly physical force if the actor reasonably believes that such other person is:
 

 “(1) Using or about to use unlawful deadly physical force; or
 

 “(2) Using or about to use physical force against an occupant of a dwelling while committing or attempting to commit a burglary of such dwelling; or
 

 “(3) Committing or about to commit a kidnapping in any degree, assault in the first or second degree, burglary in any degree, robbery in any degree ....”
 
 [7]
 

 In
 
 Williams v. State,
 
 938 So.2d 440 (Ala. Crim.App.2005), this Court addressed a similar issue as follows:
 

 “An accused has the right to have the jury charged on ‘ “any material hypothesis which the evidence in his favor tends to establish.” ’
 
 Ex parte Stork,
 
 475 So.2d 623, 624 (Ala.1985). ‘In determining whether an instruction was supported by the evidence the question is not whether the Supreme Court or Court of Criminal Appeals believes the evidence, but simply whether such evidence was presented.’
 
 Id.
 
 ‘[Ejvery accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility.’
 
 Ex parte Chavers,
 
 361 So.2d 1106, 1107 (Ala.1978). ‘ “ ‘It is a basic tenet of Alabama law that “a party is entitled to have his theory of the case, made by the pleadings and issues, presented to the jury by proper instruction, ... and the [trial] court’s failure to give those instructions is reversible error.” ’ ” ’
 
 Ex parte McGriff,
 
 908 So.2d 1024, 1035 (Ala.2004), quoting
 
 Winner Int’l Corp. v. Common Sense, Inc.,
 
 863 So.2d 1088, 1091 (Ala.2003), quoting in turn other cases. ‘In order to determine whether the evidence is sufficient to necessitate an instruction and to allow the jury to consider the defense, we must view the testimony most favorably to the defendant.’
 
 Ex parte Pettway,
 
 594 So.2d 1196, 1200 (Ala.1991).”
 

 Williams,
 
 938 So.2d at 444-45. Further, “As this Court explained in
 
 King v. State,
 
 478 So.2d 318 (Ala.Crim.App.1985):
 

 “‘The general rule is that “every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility.”
 
 Chavers v. State,
 
 361 So.2d 1106, 1107 (Ala.1978). If there is
 
 “any evidence, however slight,
 
 tending to support” that the defendant acted in self-defense, the issue should be submitted to the jury.
 
 *241
 

 King v. State,
 
 71 Ala. 1, 4 (1881). In most cases, the issue of self-defense is one of ultimate facts solely for determination by the jury,
 
 Domingus v. State,
 
 94 Ala. 9, 11 So. 190 (1892), however
 
 “unsatisfactory and inconclusive to the judicial mind ”
 
 the evidence of self-defense may appear.
 
 Burns v. State,
 
 229 Ala. 68, 70, 155 So. 561, 562 (1934).
 

 “ ‘However, the court should not instruct on the law of self-defense where there is no evidence to sustain the plea.
 
 Raines v. State,
 
 455 So.2d 967, 974 (Ala.Cr.App.1984);
 
 Tarver v. State,
 
 137 Ala. 29, 34 So. 627 (1903); C. Gamble,
 
 McElroy’s Alabama Evidence,
 
 § 457.02(5) (3d ed.1977). “[I]n the absence of all evidence having a tendency to show that at the time of the killing the accused was in imminent peril of life, or grievous bodily harm, or of the existence of circumstances creating in his mind a reasonable belief of such peril, ... these instructions were abstract.”
 
 King,
 
 71 Ala. at 4-5. A trial judge may properly refuse to charge the jury on self-defense where he determines that “the defendant could not set up self-defense under the facts.”
 
 Consford v. State,
 
 15 Ala.App. 627, 634, 74 So. 740, 743, cert. denied, 200 Ala. 23, 75 So. 335 (1917).
 

 “ ‘In determining whether to charge the jury on self-defense,
 
 “evidence most favorable to the defendant should be considered
 
 and if there is the
 
 slightest evidence
 
 tending to prove a hostile demonstration which can be reasonably interpreted as placing the accused, at the time of the killing, in apparent imminent danger to life or other grievous bodily harm then the matter of self-defense becomes a question for the jury.”
 
 Byrd v. State,
 
 257 Ala. 100, 104, 57 So.2d 388, 391 (1952).
 

 “ ‘Before the issue of self-defense is submitted to the jury, the defendant has the burden of proving, among other things, that he “reasonably believe[d],” Alabama Code 1975, § 13A-3-23, that his attacker was about to use unlawful deadly physical force, “unless this fact arises out of the evidence produced against him to prove the homicide.”
 
 Cosby v. State,
 
 269 Ala. 501, 505, 114 So.2d 250, 253 (1959).
 

 “ ‘ “In the absence of evidence tending to show both that the appellant was in actual or apparent imminent peril and that he was unable to retreat, it is assumed that he was not in such peril and that he was able to retreat. It necessarily follows that the accused has the burden of producing evidence warranting both of such findings and that the discharge of that burden is one of the conditions precedent to his being entitled to having his claim of self-defense submitted to the jury.
 
 Naugher v. State,
 
 105 Ala. 26, 17 So. 24;
 
 Cosby v. State,
 
 269 Ala. 501, 114 So.2d 250.”
 
 Payne v. State,
 
 48 Ala.App. 401, 406-07, 265 So.2d 185, 190, cert. denied, 288 Ala. 748, 265 So.2d 192, cert. denied, 409 U.S. 1079, 93 S.Ct. 703, 34 L.Ed.2d 669 (1972).
 

 “‘This belief that the assailant is going to use unlawful deadly physical force must be both honestly entertained and reasonable.
 

 “ ‘ “The law requires that a belief of imminent peril and urgent necessity to slay in self-defense, though it may be based on appearances, must be both well-founded and honestly entertained.
 
 Williams v. State,
 
 161
 
 *242
 
 Ala. 52, 59, 50 So. 59 (1909). A merely ‘honest’ belief, unless a reasonable one, that the killing was necessary, will not make it justifiable.
 

 “ ‘ “ ‘It is not an honest, but a reasonable belief, that justifies. An honest may not be a reasonable belief; it may be the offspring of fear, alarm or cowardice, or it may be the result of carelessness, and irrational. A reasonable belief, generated by the attendant circumstances— circumstances fairly creating it— honestly entertained, will justify a homicide; but not an irrational belief, however honest it may be.’
 
 Holley v. State,
 
 75 Ala. 14, 19 (1883).”
 
 Howard v. State,
 
 420 So.2d 828, 832 (Ala.Cr.App.1982).
 

 “ ‘ “The question is not merely what the defendant believed, but also, what did he have the right to believe.” Alabama Code 1975, § 13A-3-23 Commentary.
 

 [[Image here]]
 

 “ ‘However, “[t]he reasonableness of an apprehension of death or great bodily injury is a question of fact for the jury.” F. Wharton,
 
 The Law of Homicide,
 
 § 287 at 462 (3d ed.1907). “[I]t is a question for the jury to satisfy itself from all the evidence in the case whether or not the defendant was in imminent and manifest danger either of losing his own life or of suffering grievous bodily harm, or that it appeared so to the mind of a reasonable man.”
 
 Dilburn v. State,
 
 16 Ala.App. 371, 372, 77 So. 983, 984 (1918). See also
 
 Kennedy v. State,
 
 240 Ala. 89, 196 So. 884 (1940);
 
 Moore v. State,
 
 54 Ala.App. 22, 304 So.2d 263, cert. denied, 293 Ala. 768, 304 So.2d 268 (1974);
 
 Sterrett v. State,
 
 31 Ala. App. 161, 13 So.2d 776, cert. denied, 244 Ala. 367, 13 So.2d 780 (1943).
 

 [[Image here]]
 

 “‘Whether the accused reasonably believes that another person is using or is about to use unlawful deadly physical force against him is a question for the jury. “The law requires that the circumstances should be such as to create a reasonable belief of impending necessity. These circumstances are to be ascertained by the jury ...”
 
 Oliver v. State,
 
 17 Ala. 587, 599 (1850). “It is solely for the jury to determine whether any particular inference that may possibly be drawn from given facts is or is not a reasonable inference, and not for the court to substitute its judgment for theirs in passing upon the character of inferences afforded by the evidence.”
 
 Domingus v. State,
 
 94 Ala. 9, 13, 11 So. 190, 192 (1892) (error to charge jury that from certain facts they might reasonably infer that defendant was not in imminent danger).
 

 “‘“The law of self-defense makes use of (1) rules, and (2) the reasonable-person standard. The court determines what the rules are, but it is for the jury to determine whether the standard has been met by the evidence in the particular case.” R. Perkins & R. Boyce,
 
 Criminal Law
 
 1116 (3d ed.1982). “It is to be noted that reasonableness is determined by a standard — a reasonable person under like circumstances — and the determination is made by the jury.” Perkins, at 1117. “A self-defense ... instruction should be given when any evidence is given showing the defendant’s subjective belief that the use of force was necessary.” Perkins, at 1115-16, quoting
 
 People v. Lockett,
 
 82 Ill.2d 546, 45 Ill.Dec. 900, 903, 413 N.E.2d 378, 381 (1980).’
 

 
 *243
 
 “478 So.2d at 819-22 (emphasis added).
 

 “Similarly, in
 
 Lemley v. State,
 
 599 So.2d 64 (Ala.Crim.App.1992), this Court stated:
 

 “ ‘If there is
 
 any evidence
 
 to show a hostile demonstration that can be reasonably considered as having placed the accused in apparent imminent danger of his life, the issue of self-defense is for the jury.
 
 Turner v. State,
 
 160 Ala. 40, 43, 49 So. 828, 829 (1909).
 
 “The question as to whether or not the circumstances in which the parties were at the time the fatal blow was stricken were such as to impress a reasonable man that the defendant was in imminent danger of losing his life or suffering great bodily harm, and whether or not the defendant entertained such belief were inferential facts to be drawn by the jury.” Kennedy v. State,
 
 240 Ala. 89, 91, 196 So. 884, 885 (1940).
 
 Whether the accused was in imminent peril at the time he shot the victim is a question of fact for the jury. Cook v. State,
 
 46 Ala.App. 663, 665, 248 So.2d 158, 160 (1971).
 
 It is solely for the jury to determine whether the inference that accused was in actual or apparent immediate peril is reasonable. Domingus v. State,
 
 94 Ala. 9, 13, 11 So. 190, 192 (1891).
 

 “ ‘
 
 “The rule of self-defense is that persons may and must act on the reasonable appearance of things.
 
 While it is not required that where a person is menaced he must wait until a weapon is presented ready for deadly execution, yet the danger must be real or so manifestly apparent as to create a reasonable belief of presently impending peril to life or limb. In determining this question
 
 evidence most favorable to the defendant should be considered
 
 and if there is the
 
 slightest evidence
 
 tending to prove a hostile demonstration which can be reasonably interpreted as placing the accused, at the time of the killing, in apparent imminent danger to life or other grievous bodily harm then the matter of self-defense becomes a question of fact for the jury.”
 

 “
 
 ‘Byrd v. State,
 
 257 Ala. 100, 104, 57 So.2d 388, 391 (1952). See also
 
 Raines v. State,
 
 455 So.2d 967, 974 (Ala.Cr.App.1984).’
 

 “599 So.2d at 74 (emphasis added). See also
 
 Ex parte Pettway,
 
 supra, and
 
 Mordecai v. State,
 
 858 So.2d 993 (Ala.Crim.App.2003).”
 

 Williams,
 
 938 So.2d at 445-48.
 

 In
 
 Ex parte Edwards,
 
 452 So.2d 503 (Ala.1983), the Alabama Supreme Court held that a private citizen may resist an attempt by law enforcement to subject him to an illegal arrest so long as he does not cause serious injury to the officer. The Court further cautioned, however, that the citizen was not authorized to kill an officer in resisting the illegal arrest, except in self-defense where the force used against the citizen was felonious rather then merely forcible. As this Court indicated in
 
 Odoms v. State,
 
 359 So.2d 1162 (Ala.Crim. App.1978), a person was authorized under common law to kill an officer in resisting an unlawful arrest only where necessary to save his own life or to save himself from serious bodily harm, provided that the necessity was real or apparent.
 

 The undisputed evidence indicated that the officers were at the residence to execute an outstanding arrest warrant on Woods; that Woods refused to comply with the officers’ demands to come outside and instead turned and fled into the apartment; and that the officers pursued Woods into the apartment. The undisputed evidence further indicated that Spencer
 
 *244
 
 had been asleep at the time the officers arrived; that he awakened, hearing commotion in the other end of the apartment; that, he looked outside and saw police vehicles; that he rushed toward the commotion; that when he encountered the officers he fatally shot Officers Owen and Chisolm in the kitchen area of the apartment; that he turned and fatally shot Officer Bennett, who was near the front door of the apartment; and that he shot Officer Collins outside the back door of the apartment and fired additional shots at Officer Collins as Collins took cover behind his police car. The uncontroverted evidence further indicated that Spencer fired a final shot point-blank into Officer Bennett’s head, as Officer Bennett lay on the ground outside the apartment. Additionally, although neither witness believed at the time that Spencer was serious, one witness testified that Spencer had made statements about the officers, following the initial encounter the morning of the shooting, indicating that he was going to “bust 'em,” which the witness said he interpreted to mean that Spencer was going to shoot the officers if they returned. (R. 913.) Another witness testified that she heard Spencer and Woods remark that “they was gonna get” the officers if they returned. (R. 1638.)
 

 Spencer may indeed have had a fear of the officers, but based on the evidence presented, we cannot say that that fear was reasonable. Further, Spencer’s actions contributed to the earlier confrontations with the officers; he made statements between the earlier encounter and the fatal encounter indicating that he would kill the officers if they returned. Additionally, the evidence indicates that, upon hearing the commotion in the kitchen and looking outside and seeing police vehicles, Spencer had time to attempt to retreat by attempting to hide or escape from a window; however, he armed himself and proceeded to advance toward the commotion and a certain encounter with officers. He shot the first two officers repeatedly in the back and the third officer at pointblank range in the head some period of time after that officer had been mortally wounded by a gunshot to the chest that impacted numerous internal organs and the spinal cord. Finally, Spencer failed to meet his burden of showing that the officers were in the apartment with a felonious intent. Having reviewed the applicable legal authority, the arguments of the parties, and the record before this Court, we cannot say that reversible error occurred as to this claim. Therefore, we conclude that the trial court did not commit reversible error in refusing to instruct the jury on self-defense.
 

 V.
 

 Spencer next contends that the trial court erred in refusing to instruct the jury on heat-of-passion manslaughter as a lesser-included offense.
 

 Section 13A-6-3, Ala.Code 1975, states, in pertinent part:
 

 “(a) A person commits the crime of manslaughter if:
 

 [[Image here]]
 

 “(2) He causes the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due to a sudden heat of passion
 
 caused by provocation recognized by law,
 
 and before a reasonable time for the passion to cool and for reason to reassert itself.”
 

 (Emphasis added.) It is well settled that even where the defendant commits the killing due to a sudden heat of passion, an instruction on manslaughter is properly refused where there is no evidence that that sudden heat of passion was caused by
 
 *245
 
 a provocation recognized by law.
 
 Harrison v. State,
 
 580 So.2d 73, 74 (Ala.Crim.App.1991).
 

 “ ‘Alabama courts have, in fact, recognized three legal provocations sufficient to reduce murder to manslaughter: (1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (3) when the accused witnesses an assault on a family member or close relative.’
 

 “Rogers v. State,
 
 819 So.2d 643, 662 (Ala.Crim.App.2001).
 

 “ ‘ “[Section] 13A-6-3(a)(2) is designed to cover those situations where the jury does not believe a defendant is guilty of murder but also does not believe the killing was totally justified by self-defense.”
 
 Shultz v. State,
 
 480 So.2d 73, 76 (Ala.Crim.App.1985). See also
 
 Shiflett v. State,
 
 507 So.2d 1056 (Ala.Crim.App.1987).
 

 “ ‘ “To constitute adequate legal provocation, it must be of a nature calculated to influence the passions of the ordinary, reasonable man.... ”
 

 “
 
 ‘Biggs v. State,
 
 441 So.2d 989, 992 (Ala.Crim.App.1983).’
 

 “Hafford v. State,
 
 674 So.2d 1386, 1390 (Ala.Crim.App.1995).”
 

 Peraita v. State,
 
 897 So.2d 1161, 1198 (Ala.Crim.App.2003).
 

 Here, based on the evidence supporting Spencer’s theory of events, the events leading up to the shootings, even if creating a sense of passion or mental or emotional imbalance, did not constitute a legally recognized provocation. It is apparent that neither the first (accused witnesses his spouse committing adultery) nor the third (accused witnesses an assault on a family member or close relative) legally recognized provocation is applicable in this case. As to whether the second legally recognized provocation (whether Spencer was assaulted or faced with an imminent assault on himself) is applicable under the facts of this case, we have reviewed the evidence and answer that question in negative.
 

 Even assuming, without finding as true, Spencer’s contentions that the officers made remarks during the earlier encounter that caused Spencer to fear that the officers would hurt or kill him, those comments were made hours before the final encounter where the officers were killed. Additionally, the initial arguments were between Woods and officers; Spencer willingly joined in the verbal jousting, and again continued his verbal sparring with a second officer even though the first officer had, according to Spencer, made threatening comments. Further, the first two officers Spencer encountered during the final and fatal engagement were shot repeatedly in the back while attempting to exercise a lawful arrest on Woods. The evidence also indicates that Spencer made statements following the earlier encounters with the officers that if the officers returned he would “bust 'em” (R. 913), and that “they was gonna get” the officers if they returned. (R. 1638.) Additionally, Spencer, knowing that the officers had returned because he looked out the window, exacerbated the situation by intentionally grabbing his loaded SKS assault rifle and proceeding toward the commotion in the kitchen. This evidence further militates against any contention that the murders were committed in a sudden passion and thus warranted such a jury instruction. Because the evidence did not support a charge on heat-of-passion manslaughter, the trial court properly rejected Spencer’s request for such a charge.
 

 
 *246
 
 VI.
 

 Spencer next challenges the trial court’s use of the State’s requested jury instructions number eight and number nine.
 

 A.
 

 “No party may assign as error the court’s giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection.”
 

 Rule 21.3, Ala.R.Crim.P.
 

 Spencer objected during the charge conference when the trial court indicated that it intended to give the now complained-of instructions; his objection was that the officers were not there to effect an arrest of Spencer and that when they went to the apartment to arrest Woods the officers did not necessarily have the warrant in their immediate possession upon request. Therefore, Spencer properly preserved those grounds for review even though he did not object to the trial court’s instructing the jury on the State’s requested instructions eight and nine at the conclusion of the court’s oral charge. See, e.g.
 
 Molton v. State,
 
 651 So.2d 663, 666 (Ala.Crim.App.1994) (“Where ... a defendant clearly objects at the charge conference to the trial court’s refusal to give a written requested charge and states specific reasons for that objection, he is not required to renew his objection at the close of the oral instructions to preserve that issue for appellate review.”).
 

 However, Spencer does not raise those same grounds on appeal. Rather, he now argues that the trial court’s giving the State’s requested instructions eight and nine and refusing the defense’s requested instructions on self-defense, provocation, and felonious arrest was in essence an affirmative charge for the jury to return a finding of guilt and reduced the State’s overall burden of proof. It is well settled that “[t]he statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.”
 
 Ex parte Frith,
 
 526 So.2d 880, 882 (Ala.1987). Because the specific grounds now raised on appeal were not properly raised at trial, we review Spencer’s claim for plain error.
 

 B.
 

 “ ‘A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case.
 
 Raper v. State,
 
 584 So.2d 544 (Ala.Cr.App.1991). A trial court’s oral charge to the jury must be construed as a whole, and must be given a reasonable — not a strained — construction.
 
 King v. State,
 
 595 So.2d 539 (Ala.Cr.App.1991);
 
 Kennedy v. State,
 
 472 So.2d 1092 (Ala.Cr.App.1984).’ ”
 

 Sneed v. State,
 
 1 So.3d 104, 123 (Ala.Crim.App.2007), quoting
 
 Williams v. State,
 
 710 So.2d 1276, 1305 (Ala.Crim.App.1996),
 
 aff'd,
 
 710 So.2d 1350 (Ala.1997).
 

 The trial court instructed the jury, in pertinent part, as follows:
 

 “Number eight. Ladies and gentlemen, a peace officer — and this is directly out of the Code of Alabama 1975, § 13A-3-27. A peace officer is justified in using that degree of physical force which he reasonably believes to be necessary, upon a person in order to: One, make an arrest for a misdemeanor, violation or violation of a criminal ordinance, or to prevent the escape from custody of a person arrested for a misdemeanor, violation or violation of a
 
 *247
 
 criminal ordinance, unless the peace officer knows the arrest is unauthorized.
 

 [[Image here]]
 

 “This is number nine. This comes out of the Code of Alabama 1975, § 13A-3-28. A person may not use physical force to resist a lawful arrest by a peace officer who is known or reasonably appears to be a police officer.”
 

 (R. 1831-32.)
 

 Clearly these instructions, tracking the language of § 13A-3-27(a)(l) and § 13A-3-28, Ala.Code 1975, were accurate reflections of the law. Further, when the jury instructions are viewed as a whole, the complained-of excerpts were appropriate considering the facts of the ease. The trial court thoroughly instructed the jury, among other things, on the elements of each charge and on the State’s burden of proof. Despite Spencer’s assertions to the contrary, the instructions did not lessen the State’s burden or amount to an affirmative charge for the jury to return a finding of guilt. Thus, we find no error, plain or otherwise, in the trial court’s giving of the State’s requested instructions eight and nine. Therefore, Spencer is not entitled to any relief on this claim.
 

 VII.
 

 Spencer, citing
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), next argues that his sentence of death is unconstitutional. Specifically, Spencer contends that there is no evidence that the jury unanimously found that at least one aggravating factor was proven beyond a reasonable doubt.
 

 In
 
 Brownfield v. State,
 
 44 So.3d 1 (Ala.Crim.App.2007), this Court noted that both this Court and the Alabama Supreme Court have repeatedly held that the United States Supreme Court in
 
 Ring
 
 did not invalidate Alabama’s death-penalty statute. See, e.g.,
 
 Ex parte Hodges,
 
 856 So.2d 936 (Ala.2003);
 
 Ex parte Waldrop,
 
 859 So.2d 1181 (Ala.2002);
 
 Duke v. State,
 
 889 So.2d 1, 41 (Ala.Crim.App.2002) (opinion on return to remand), cert, granted, sentence of death vacated pursuant to
 
 Roper v. Simmons,
 
 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005),
 
 Duke v. Alabama,
 
 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005);
 
 Turner v. State,
 
 924 So.2d 737 (Ala.Crim.App.2002);
 
 Stallworth v. State,
 
 868 So.2d 1128, 1178 (Ala.Crim.App.2001) (opinion on return to second remand). See also
 
 Harris v. State,
 
 2 So.3d 880 (Ala.Crim.App.2007), and
 
 Eatmon v. State,
 
 992 So.2d 64 (Ala.Crim.App.2007).
 

 “In recognizing the narrowness of the United States Supreme Court’s holding in
 
 Ring,
 
 this Court has noted that although ‘[t]he
 
 Ring
 
 Court held that any aggravating circumstance that increased a sentence to death must be proved to a jury beyond a reasonable doubt,’ the
 
 Ring
 
 Court ‘did not reach the question whether judicial sentencing or judicial override was constitutional.’
 
 Stallworth v. State,
 
 868 So.2d [1128] at 1183 [(Ala.Crim.App.2001)] (opinion on return to second remand).”
 

 Brownfield,
 
 44 So.3d at 36.
 

 In Act No. 99-403, Ala. Acts 1999, the Alabama Legislature amended § 13A-5-49, Ala.Code 1975, to include, among other things, § 13A-5-49(9), which provides as a statutory aggravating circumstance that “[t]he defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct.” In
 
 Ex parte Stephens,
 
 982 So.2d 1148 (Ala.2006), the Alabama Supreme Court indicated that an instruction that a guilty verdict on the capital offense set out in § 13A-5-40(a)(10) (two or more persons) established the existence of that statutory aggravating circumstance when the offense was committed on or after the September 1, 1999, effective date of the
 
 *248
 
 legislative amendment to the statute. See also
 
 Pilley v. State,
 
 930 So.2d 550 (Ala.Crim.App.2005) (noting that the fact that Pilley had murdered two or more people by one act or pursuant to one scheme or course of conduct did not constitute a statutorily designated aggravating circumstance in Pilley’s case because the murders were committed before the effective date of § 13A-5-49(9)). Here, the murders were committed years after the effective date of § 13A-5-49(9). Therefore, in returning a guilty verdict as to the charged capital offense of the murder of two or more people during one act or pursuant to one scheme or course of conduct, the jury of necessity unanimously found that that statutory aggravating circumstance had been proven beyond a reasonable doubt, i.e., § 13A-5-49(9), Ala.Code 1975. See, e.g.,
 
 Stallworth v. State,
 
 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to remand) (if the aggravating circumstance that elevated the punishment to death was also an element of the capital offense,
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 120 S.Ct. 2348,147 L.Ed.2d 435 (2000), was not violated because the jury’s verdict in the guilt phase found that fact to exist beyond a reasonable doubt). See also
 
 Brownfield v. State,
 
 supra (jury conviction of the capital offense of the murder of two or more people during one act or pursuant to one scheme or course of conduct satisfied the requirement that an aggravating circumstance be found by the jury and the verdict itself rendered the defendant eligible for the death penalty, exposing him to a range of punishment that included the death penalty); and
 
 Yeomans v. State,
 
 898 So.2d 878 (Ala.Crim.App.2004) (same). Thus, the limited mandates of
 
 Ring
 
 have been satisfied in this case, because by returning a guilty verdict in case no. CC-04-4383 as to the capital offense of the murder wherein two or more persons are murdered by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), the jury unanimously found at least one statutory aggravating circumstance, making Spencer eligible for the death penalty. Therefore, Spencer is not entitled to any relief on this claim.
 

 VIII.
 

 Finally, Spencer argues that the jury-verdict-override sentencing scheme of Alabama’s capital-murder statute is unconstitutional for a number of reasons.
 

 Both this Court and the Alabama Supreme Court have repeatedly denied the very claims now raised by Spencer on appeal. See
 
 Brownfield v. State, supra,
 
 and the cases cited therein, with regard to the impact of
 
 Ring
 
 on Alabama’s capital-murder statute and sentencing scheme. See also
 
 Ex parte Waldrop,
 
 859 So.2d 1181 (Ala.2002), with regard to Spencer’s contention regarding the weighing of aggravating and
 
 mitigating
 
 circumstances.
 

 IX.
 

 In accordance with Rule 45A, Ala. R.App.P., we have searched the record, with respect to Spencer’s capital-murder convictions, for any error that may have adversely affected Spencer’s substantial rights and have found no plain error or defect in the guilt-phase proceedings of the trial. See Rule 45A, Ala.R.App.P.
 

 However, with regard to the sentencing order, although the trial court made thorough and specific findings of fact regarding the statutory aggravating circumstances and statutory mitigating circumstances, it did not make specific findings of fact regarding the existence or nonexistence of nonstatutory mitigating circumstances offered pursuant to § 13A-5-52. Rather, the trial court stated in its amended sentencing order that it had
 
 *249
 
 considered all of the matters presented to the court, including
 

 “the testimony heard at trial and at the sentencing hearing before this Court, both in mitigation and aggravation,
 
 considering the non-statutory evidence of mitigation of the defendant’s background
 
 and the recommendation of the jury in its recommendation of life without parole, and after taking into consideration all of the other matters that were proffered before this Court as here and above stated in this order.... ”
 

 (C. 98.) (Emphasis added.) Thus, although it is apparent that the trial court
 
 considered
 
 the evidence Spencer offered as nonstatutory mitigating circumstances, it is not clear from the record whether the trial court
 
 found
 
 any of the evidence to actually constitute nonstatutory mitigation.
 

 In addressing a similar situation on the appeal of Nathaniel Woods, this Court recently noted:
 

 “In
 
 Morrow v. State,
 
 928 So.2d 315 (Ala.Crim.App.2004), this Court addressed a similar situation:
 

 “ ‘In addition, in its order, the trial court stated the following regarding nonstatutory mitigating circumstances:
 

 “ ‘ “The Judge, just as the jury, is entitled to consider anything, any matter that the Court might find in any way to be mitigating in order to consider the same and balance the same with the aggravating circumstances as found by the Court. There was evidence and testimony presented during the trial and sentencing phases of the Defendant’s home life, early family life, lack of education and lack of a functional and traditional family unit. The Court has carefully considered all of the evidence presented during all stages of the trial in this cause, as well as the Court’s observation and evidence admitted during all proceedings, pretrial and posttrial with regard to this case and the Court finds that mitigating circumstances exist with regard to this case.”
 

 “‘(C. 17.) The trial court indicated that it found nonstatutory mitigating circumstances to exist, but it failed to identify which nonstatutory mitigating circumstances it found to exist. As this Court stated in
 
 Roberts v. State,
 
 735 So.2d 1244 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.1999):
 

 “ ‘ “In capital cases, it is the duty of this court to independently determine whether the sentence of death is appropriate in a particular case. In order to reach this conclusion, we must reweigh the aggravating circumstances and the mitigating circumstances
 
 as found by the trial court.”
 

 “ ‘735 So.2d at 1269 (emphasis added). See also
 
 Guthrie v. State,
 
 689 So.2d 935 (Ala.Crim.App.1996), aff'd, 689 So.2d 951 (Ala.1997). Although “the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating,”
 
 Williams v. State,
 
 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), in order for this Court to conduct its review of the death sentence, the trial court must specifically identify in its sentencing order those nonstatutory mitigating circumstances that it did find to exist.’
 

 “928 So.2d at 326-27. More recently, in
 
 Scott v. State,
 
 937 So.2d 1065 (Ala.Crim.App.2005), this Court remanded the case for clarification of the sentencing order, noting in part:
 

 
 *250
 
 “ Tn a listing of mitigating circumstances the court found
 
 not
 
 to exist, the court included, “Any other mitigating circumstance offered pursuant to § 18A-5-52,
 
 Code of Alabama
 
 1975.” (C. 77.) In the next paragraph of the sentencing order, however, the court stated, “The Court considered the evidence presented by the defendant as evidence of non-statutory mitigating factors.” (C. 77.) Although the trial court need not list and make findings as to each item of alleged nonstatutory mitigating evidence offered by a defendant,
 
 Reeves v. State,
 
 807 So.2d 18, 48 (Ala.Crim.App.2000), it must make a clear finding regarding the existence or nonexistence of nonstatutory mitigating evidence offered by a defendant. § 13A-5-47(d), Ala.Code 1975. The sentencing order is unclear as to whether the court found any nonstatu-tory mitigating circumstances to exist. On remand, this ambiguity must be clarified.’
 

 “937 So.2d at 1087-88.”
 

 Woods v. State,
 
 13 So.3d 1, 39-40 (Ala.Crim.App.2007).
 

 Further, Alabama’s judicial override statute, codified at § 13A-5^7(e), Ala. Code 1975, provides:
 

 “In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to Section 13A-5-46(a) or Section 13A-5-46(g). While the jury’s recommendation concerning sentence shall be given consideration, it is not binding upon the court.”
 

 Here, although the trial court referenced the jury’s recommendation that Spencer be sentenced to life imprisonment without parole, the circuit court’s order did not state that the trial court found the jury’s recommendation to be a mitigating circumstance and did not contain written findings concerning what weight that jury recommendation was given, or the reasons why it overrode the jury’s recommendation. See
 
 Ex parte Carroll,
 
 852 So.2d 833 (Ala.2002) (“[A jury’s recommendation of life imprisonment without parole] is to be treated as a mitigating circumstance.”); and
 
 Ex parte Taylor,
 
 808 So.2d 1215, 1219 (Ala.2001) (“[T]he trial judge must state specific reasons for giving the jury’s recommendation the consideration he gave it.”). See also
 
 Ex parte Tomlin,
 
 909 So.2d 283 (Ala.2003).
 

 As in
 
 Woods
 
 and the cases cited therein, the trial court here did not enter specific findings as to the existence or nonexistence of nonstatutory mitigating circumstances, and the principles espoused in
 
 Ex parte Taylor, Ex parte Tomlin,
 
 and
 
 Ex parte Carroll,
 
 and the cases cited therein, were not met as the trial court’s sentencing order did not state that the jury’s recommendation was treated as a mitigating circumstance and did not contain specific findings as to the weight assigned to the jury’s recommendation of life imprisonment without parole or the reasons for the judicial override of that recommendation. Thus, we must remand this case to the trial court for it to amend its sentencing order to clarify its findings regarding the nonstatutory mitigating circumstances and judicial override of the jury’s recommendation of life imprisonment without parole. On remand, the trial court should reweigh the aggravating and mitigating circumstances and resentence Spencer. The trial court’s amended sentencing order shall be submitted to this Court within 42 days of the date of this opinion. We pretermit our
 
 *251
 
 plain-error review of Spencer’s death sentence pending the trial court’s return to remand.
 

 AFFIRMED AS TO CONVICTIONS; REMANDED WITH DIRECTIONS AS TO SENTENCING.
 

 BASCHAB, P.J., and SHAW, WISE, and WELCH, JJ., concur.
 

 On Return to Remand
 

 McMILLAN, Retired Appellate Judge.
 

 On April 4, 2008, this Court affirmed Kerry Spencer’s convictions for four counts of capital murder for the shooting deaths of Birmingham police officers Carlos Owen, Harley A. Chisolm III, and Charles R. Bennett, and for the attempted murder of Officer Michael Collins; however, we remanded this case for the trial court “to amend its sentencing order to clarify its findings regarding the nonstatu-tory mitigating circumstances and judicial override of the jury’s recommendation of life imprisonment without parole,” see § 13A-5-52 and § 13A-5-47(d), Ala.Code 1975, and to reweigh the aggravating circumstances and the mitigating circumstances and to resentence Spencer.
 
 Spencer v. State,
 
 58 So.3d 215, 250 (Ala. Crim.App.2008). The trial court has complied with our instructions and has submitted on remand an amended sentencing order, again sentencing Spencer to death.
 

 I.
 

 Citing
 
 Ex parte Taylor,
 
 808 So.2d 1215 (Ala.2001), and
 
 Ex parte Carroll,
 
 852 So.2d 833 (Ala.2002), Spencer argues on return to remand that the trial court could not override the jury’s recommendation of life imprisonment without the possibility of parole absent reliance on some evidence or facts unknown to the jury that impacted the factual basis for the jury’s sentencing recommendation. However, as the State argues in its brief on return to remand, this Court has considered and rejected that interpretation of
 
 Ex parte Taylor
 
 and
 
 Ex parte Carroll
 
 in prior opinions. In
 
 Sneed v. State,
 
 1 So.3d 104 (Ala.Crim.App.2007), this Court addressed a similar issue; after discussing the Supreme Court’s holdings in
 
 Taylor
 
 and
 
 Carroll,
 
 this Court stated:
 

 “In
 
 Ex parte Carroll,
 
 the supreme court held that a jury’s recommendation of imprisonment for life without the possibility of parole must be considered as a mitigating circumstance. Although the supreme court also stated that a jury recommendation could be overridden based on information that was not known to the jury, it did not state that that was the only circumstance in which a jury recommendation could be overridden.
 

 “In this case, the trial court considered the jury’s recommendation as a nonstatutory mitigating circumstance and gave it moderate weight. It then stated specific - reasons for giving the jury’s recommendation the consideration it gave it, including the appellant’s participation in the robbery-murder and the jury’s vote. Therefore, we conclude that the circuit court complied with both
 
 Ex parte Taylor
 
 and
 
 Ex parte Carroll
 
 in overriding the jury’s recommendation.”
 

 1 So.3d at 116.
 

 Here, the trial court considered the jury’s recommendation as a mitigating circumstance and assigned it moderate weight. The trial court then stated specific reasons for giving the jury’s recommendation the consideration it gave it. Thus, as in
 
 Sneed,
 
 we conclude that the trial court did comply with the principles espoused in
 
 Ex parte Taylor
 
 and
 
 Ex parte Carroll
 
 in overriding the jury’s recommen
 
 *252
 
 dation. Therefore, Spencer’s claim is without merit.
 

 II.
 

 Spencer further argues that the trial court’s amended sentencing order improperly states (a) that the only evidence offered as nonstatutory mitigation evidence was Spencer’s testimony at the sentencing hearing, (b) that there was no evidence presented that Spencer’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of law was substantially impaired during the commission of this offense, and (c) that the undisputed evidence indicated that it would have been impossible for Officer Bennett to have moved after being paralyzed by the first gunshot he sustained.
 

 A.
 

 In discussing nonstatutory mitigating circumstances, the trial court’s amended sentencing order states:
 

 “The defense called [Spencer] to the stand to testify in the penalty phase before the jury. [Spencer] also testified before the Court in the sentencing phase before the Court. [Spencer] testified about his education, having completed the tenth grade. He also testified that he obtained a GED in the job corps as well as an electrician trade, but felt it was more profitable to sell drugs. He then went on to relate his version of the events that led to the shooting of these officers. During the sentencing hearing before the Court, [Spencer] testified that he was sorry for what he had done and apologized to the families of the victims. This was the sum total of the non-statutory mitigating evidence offered by [Spencer], This Court did not consider this as mitigating evidence. Although [Spencer] offered an apology for his actions, it is in direct contradiction with the undisputed facts of the case nor his statement to police after his arrest, or his testimony before the jury in the penalty phase. His attitude in both was one of entitlement or justification. He was untruthful because the undisputed physical evidence contradicts his testimony.”
 

 It is well settled that a trial court need not specify “ ‘in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating.’ ”
 
 Wilson v. State, 777
 
 So.2d 856, 892 (Ala.Crim.App.1999), quoting
 
 Williams v. State,
 
 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (emphasis omitted). Thus, it is permissible for a trial court to discuss some or even none of the nonstatu-tory mitigating evidence offered by a defendant and its reasons for concluding that that evidence was not mitigating. Here, however, the circuit court listed Spencer’s own testimony and then expressly stated that that testimony was the
 
 “sum total
 
 of the non-statutory mitigating evidence
 
 offered
 
 by the defendant.” (Emphasis added.) As Spencer correctly argues, there was additional nonstatutory mitigating evidence
 
 offered
 
 by the defense; Spencer’s mother and uncle testified at the sentencing hearing about Spencer’s upbringing and demeanor. Certainly, there may be a rational explanation for the trial court’s statements that would bring the sentencing order, as amended, within the constitutional and statutory requirements. Further, it would have been well within the trial court’s discretion to conclude that none of the evidence offered by the defense was mitigating. Finally, we cannot say that the trial court would have been in error to have determined that the additional evidence was mitigating but still to have concluded that the imposition of the death penalty was proper. However, giv
 
 *253
 
 en that the statement in the amended sentencing order that Spencer’s testimony was the
 
 only
 
 nonstatutory evidence
 
 offered
 
 is factually inaccurate, we conclude that a remand for the trial court to clarify its sentencing order is the more appropriate action, given the many levels of judicial scrutiny that occur when a defendant has been convicted of a capital offense and sentenced to death.
 

 B.
 

 In addressing the statutory mitigating offenses, the trial court’s amended sentencing order states:
 

 “There was no evidence presented that Kerry Spencer’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of law was substantially impaired during the commission of this offense; therefore, mitigating circumstance § 13A-5-51(6) was not present.”
 

 However, as Spencer argues in his brief on return to remand, there was evidence presented at trial that Spencer had ingested cocaine, Seraquel, and alcohol on the morning of the shootings. Spencer further notes that the State even requested a jury instruction on the level of intoxication necessary to negate a specific intent to kill and thus the trial court so instructed the jury. Although the evidence in the record supports the trial court’s conclusion that the mitigating circumstance in § 13A-5-51(6), Ala.Code 1975, was not present, we question the propriety of the assertion that
 
 “[tffere was no evidence presented
 
 that Kerry Spencer’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of law was substantially impaired during the commission of this offense.” (Emphasis added.) In light of the many levels of judicial scrutiny ahead in this case, we conclude it proper to again remand for the trial court to clarify its sentencing order on this point.
 

 C.
 

 With regard to Spencer’s third allegation, the amended sentencing order states:
 

 “In addition, Dr. [Gary] Simmons testified at trial that Officer Bennett, who was found dead at the front door of the apartment was shot multiple times. It was Doctor Simmons’ opinion that the first shot to Officer Bennett struck his torso severing his spine which would have made it impossible for him to move and, as he lay dying, [Spencer] shot Officer Bennett point blank in the face, the bullet passing through his brain. This undisputed physical evidence contradicts the testimony of [Spencer] who testified he fire[d] the rifle merely as a reaction to Officer Bennett touching his leg. At that point, Officer Bennett was paralyzed and would not have been able to move to touch his leg.”
 

 However, as Spencer notes in his brief on return to remand, Dr. Simmons’s testimony left open the possibility that Officer Bennett, even if only as merely an involuntary reaction, could have had random, irregular muscle contractions or twitches even after sustaining the gunshot wound to the torso. On direct examination, Dr. Simmons testified as follows: “[I]t’s likely — in my opinion, you can’t say absolutely, but it’s likely he would have been immobilized right when he sustained [the gunshot wound to the torso].” (R. 1415.) On cross-examination, the following exchange occurred:
 

 “[Defense counsel]: If somebody received gunshot wound B to the chest, would there be a short period of time afterward when myoclonic jerk could have been a factor?
 

 
 *254
 
 “[Dr. Simmons]: Jerking is caused by the fact that during the dying process you have random disorganized discharge of neurons in the brain cells and the spinal cord. They are irritated. They are dying, and so you have this random discharge and so instead of having a coordinated movement like I have when I pick up this paper clip or whatever, you have just random contractions, a seizure if you [w]ould. So it’s possible. You know, that occasionally happens. Other times people just die and they don’t have any seizures at all. More times than not they don’t, but sometimes they do.”
 

 (R. 1430.) Spencer’s testimony regarding the close-range gunshot to Officer Bennett’s head was that he was standing next to where Officer Bennett was lying on the ground, that Officer Bennett’s hand “jumped and touched [him]” and that he fired the SKS assault rifle in an “automatic reflex.” (R. 1689.) As with the two above-discussed portions of the amended sentencing order, what weight and credibility to assign the evidence rests with the trial court. However, in light of the many levels of judicial scrutiny ahead in this case, we conclude it proper to ask the trial court to clarify its sentencing order as to this point on remand.
 

 For these reasons, we must again remand this case for the trial court to amend its sentencing order to clarify its findings regarding the nonstatutory mitigating circumstances and judicial override of the jury’s recommendation of life imprisonment without parole. On remand, the trial court should reweigh the aggravating circumstances and the mitigating circumstances and resentence Spencer accordingly. The trial court’s amended sentencing order shall be submitted to this Court within 42 days of the date of this opinion. We again pretermit our plain-error review of Spencer’s death sentence pending the trial court’s return to remand.
 

 The foregoing opinion was prepared by Retired Appellate Judge H.W. “Bucky” McMillan while serving on active-duty status as a judge of this court under the provisions of § 12-18-10(e), Ala.Code 1975.
 

 REMANDED WITH DIRECTIONS.
 

 WELCH and KELLUM, JJ., concur. WISE, P.J., and WINDOM, J., concur in the result.
 

 On Return to Second Remand
 

 McMILLAN, Retired Appellate Judge.
 

 Kerry Spencer’s convictions for four counts of capital murder for the death of Birmingham Police Officers Carlos Owen, Harley A. Chisolm III, and Charles R. Bennett,
 
 [1]
 
 and for the attempted murder of Michael Collins were affirmed by this court on April 4, 2008. We remanded the case to the trial court to clarify its findings concerning the nonstatutory mitigating circumstances and the judicial override of the jury’s advisory verdict of life imprisonment without parole. § 13A-5-52 and § 13A-5-47(d), Ala.Code 1975. The trial court was also instructed to reweigh the aggravating circumstances and the mitigating circumstances in resentencing Spencer.
 
 Spencer v. State,
 
 58 So.3d 215 (Ala.Crim.App.2008). The trial court filed an amended sentencing order with this court, and on February 27, 2009, we again remanded this cause to the trial court with instructions that it amend its sentencing order to clarify its findings regarding the nonstatutory miti
 
 *255
 
 gating circumstances and the judicial override of the jury’s recommendation of life imprisonment without parole. The trial court was directed to reweigh the aggravating circumstances and the mitigating circumstances in resentencing Spencer.
 
 Spencer v. State,
 
 58 So.Sd 215 (Ala.Crim.App.2008). The trial court, on return to second remand, has submitted an amended sentencing order and has again sentenced Spencer to death.
 

 As to the trial court’s findings concerning the nonstatutory mitigating circumstances, in his second amended sentencing order the trial court states that Spencer presented evidence indicating that he was sorry for these crimes and he apologized to the victims’ families. Spencer also presented the testimony of his mother and his uncle concerning his good behavior as a child and that he was remorseful for the offenses. The trial court however did not consider this to be mitigating evidence because his specific apology directly contradicted the evidence presented, including his statement to police following his arrest and his testimony to the jury during the sentencing phase of his trial.
 

 “It is not required that the evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the sen-tencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.
 
 Cochran v. State,
 
 500 So.2d 1161 (Ala.Crim.App.1984), aff'd in pertinent part, remanded on other part, 500 So.2d 1179 (Ala.1985), aff'd on return to remand, 500 So.2d 1188 (Ala.Cr.App.), aff'd 500 So.2d 1064 (Ala.1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987).”
 

 Haney v. State,
 
 603 So.2d 368, 389 (Ala Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992). See also
 
 Lewis v. State,
 
 24 So.3d 480, 531, (Ala.Crim.App.2006);
 
 Yeomans v. State,
 
 898 So.2d 878, 904 905 (Ala.Crim.App.2004).
 

 Before reweighing the aggravating and mitigating circumstances in his amended sentencing order on return to second remand, the trial judge clearly stated that he had determined that the evidence concerning the testimony of Spencer’s mother and uncle did not constitute mitigating evidence, nor did Spencer’s proclamation of remorse and his apology to the victims’ families. The trial court did consider the jury’s recommendation of life imprisonment without parole as a mitigating circumstance, assigning this factor moderate weight because the vote was not consistent among the capital murder cases against Spencer. The trial court noted:
 

 “In CC-04-4129 the jury’s recommendation was nine (9) for life without parole and three (3) for death. In CC-04-4130 the count was ten (10) for life without parole and two (2) for death. In CC-04-4383 the count was seven (7) for life without parole and five (5) for death.”
 
 [2]
 

 The trial court’s consideration of the jury’s verdict as a mitigating circumstance and his decision- to accord it moderate weight for the reasons stated was proper, as determined by this Court in the opinion issued on return to our original remand
 
 *256
 
 order.
 
 Spencer v. State,
 
 58 So.3d 215, 251 (Ala.Crim.App.2008).
 

 In his amended sentencing order on return to second remand, the trial court has clarified its findings concerning the mitigating circumstance in § 13A-5-51 (Ala. Code 1975), as to whether Spencer was capable of appreciating the criminality of his conduct or whether his ability to conform his conduct to the requirement of the law was substantially impaired during the commission of the offenses. In his amended sentencing order on return to our first remand, the trial court found that this mitigating circumstance was not present; it determined that Spencer presented no evidence to support this mitigating circumstance. However, in our first opinion remanding this case, this Court had noted that there was evidence at trial that Spencer had ingested cocaine, Seraquel, and alcohol on the morning of the shootings, and that the State had requested a jury instruction as to the level of intoxication required to negate specific intent to kill. The trial court had given the jury such an instruction. In his amended sentencing order on return to second remand, the trial court now states as follows:
 

 “There was evidence during the guilty phase of trial that [Spencer] had ingested cocaine the night before the shooting of these officers. Between 9:00 o’clock and 10:00 o’clock the next morning he drank one beer, he took one Seraquil [sic] and possibly a very small amount of powder cocaine. The defendant then went to sleep and slept until the officers arrived around 1:00 p.m. that afternoon. The record clearly shows that more than sufficient time had elapsed between the time the last drugs or alcohol was ingested and the shooting.”
 

 Thus, the trial court clearly considered this evidence presented by Spencer when determining that this mitigating circumstance did not exist.
 

 The trial court has also clarified in this return to second remand its findings and consideration concerning evidence indicating that Spencer shot Officer Bennett a second time through the head only as a reaction to Officer Bennett’s having allegedly touched Spencer’s leg. The trial court had found in its amended sentencing order on return to the first remand that, because the first shot had paralyzed Officer Bennett, he would have been unable to touch Spencer’s leg and provoke the second shot. Spencer had argued in his brief on return to remand that Dr. Gary Simmons testified at trial that, as he was dying, Officer Bennett may have experienced seizures or jerking, resulting in the possibility of Officer Bennett’s having touched Spencer. The trial court has clarified its findings in this regard, stating:
 

 “In addition, Dr. Simmons testified at trial that Officer Bennett, who was found dead at the front door of the apartment, was shot multiple times. It was Dr. Simmons’ opinion that the first shot to Officer Bennett struck his torso severing his spine which would have made it impossible for him to move, and that as he lay dying, the defendant shot Officer Bennett point blank in the face, the bullet passing through his brain. This undisputed physical evidence contradicts the testimony of the defendant who testified that he fired the rifle merely as a reaction to Officer Bennett touching his leg. At that point, Officer Bennett was paralyzed and would not have been able to move to touch the defendant’s leg. The defendant testified that he shot Officer Bennett in the face when Officer Bennett touched his leg. Dr. Gary Simmons testified at trial as follows:
 

 
 *257
 
 “Defense counsel: ‘If somebody received gunshot wound B to the chest would there be a short period of time afterward when myoclonic jerk could have been a factor?’
 

 “Dr. Simmons: ‘Jerking is caused by the fact that during the dying process you have random disorganized discharge of neurons in the brain and the spinal cord. They are irritated. They are dying. And so you have this random discharge. And so instead of having a coordinated movement, like when I pick up this paper clip or whatever, you have just random contractions, seizures if you would. So it’s possible. You know, that occasionally happens. Other times people just die. They don’t have seizures at all. More times than not they don’t, but sometimes they do.’
 

 “This Court finds that the defendant’s story that he shot Officer Bennett out of a mere reaction to his touching his leg defies logic and common sense. The evidence from trial showed that the defendant ran out the back door of the apartment as he fired at Officer Collins as he took cover behind his patrol car. Officer Bennett’s body was found at the front door of the apartment. It is highly unlikely that the defendant walked up to the body as he lay dying on the ground knowing that there was another live officer somewhere behind him, that he had attempted to kill. This Court puts no weight on this proffered theory by the defense.”
 

 Thus, the trial court considered the evidence presented by Spencer but accorded it no weight.
 

 “[T]he weight to attach to [a] known mitigating circumstance is within the discretion of the trial court.
 
 See Bush v. State,
 
 695 So.2d 70 (Ala.Crim.App.1995), aff'd 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997).”
 
 Hodges v. State,
 
 856 So.2d 875, 893 (Ala.Crim.App.2001), aff'd 856 So.2d 936 (Ala.2003).
 

 “The circuit court must consider evidence offered in mitigation, but it is not obliged to find that the evidence constitutes a mitigating circumstance. As the Alabama Supreme Court has stated:
 

 “ ‘See
 
 Lockett v. Ohio,
 
 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978);
 
 Ex parte Hart,
 
 612 So.2d 536, 542 (Ala.1992)
 
 (“Lockett
 
 does not require that all evidence offered as mitigating evidence be found to be mitigating.”),
 
 cert. denied,
 
 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993); and
 
 Ex parte Slaton,
 
 680 So.2d 909, 924 (1996) (“ While
 
 Lockett
 
 and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.’ ”) (quoting
 
 Bankhead v. State,
 
 585 So.2d 97, 108 (Ala.Crim.App.1989)).’
 

 “Ex parte Ferguson,
 
 814 So.2d 970, 976 (Ala.2001).”
 

 Calhoun v. State,
 
 932 So.2d 923, 975 (Ala.Crim.App.2005), cert. denied, 548 U.S. 926, 126 S.Ct. 2984, 165 L.Ed.2d 990 (2006).
 

 This court previously pretermitted a plain-error review of Spencer’s sentencing proceeding, pending the trial court’s return to our remand order. Because the trial court has complied with the requirements of our remand concerning its sentencing order, Spencer’s sentencing will now be reviewed pursuant to Rule 45A, Ala.R.App.P. As required pursuant to that rule, we have searched the entire proceedings and found no plain error or defect that has or probably has adversely affected any of Spencer’s substantial rights.
 
 *258
 
 We have also reviewed the propriety of the sentence of death as required by § 13A-5-53(a), Ala.Code 1975. It is the finding of this Court that there is no error in the sentencing that adversely affected Spencer’s rights.
 

 The trial court found the existence of four aggravating circumstances: that Spencer knowingly created a great risk of death to many persons in the commission of this crime, § 13A-5-49(3), Ala.Code 1975; that the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, § 13A-5-49(5),' Ala.Code 1975; that the capital offense was committed to disrupt or hinder the lawful exercise of a government function or the enforcement of laws, § 13A-5^49(7), Ala.Code 1975; and that Spencer intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct, § 13A-5-49(9), Alabama Code 1975. The trial court further found the existence of two statutory mitigating circumstances: Spencer’s age, pursuant to § 13A-5-51(7) Ala.Code 1975, which was 24 at the time of the events; and the lack of significant history of prior criminal activity, § 13A-5-51(l), Ala.Code 1975. As to the former, the trial court found that Spencer’s age of 24 at the time of the offense was young but not so young as to carry great weight. Moreover, the trial court attached little weight to Spencer’s lack of significant history of prior criminal activity. As to other mitigating evidence, the trial court found that the evidence showing that Spencer had obtained a GED and was an electrician by trade did not carry any significant weight. Finally, the trial court considered as a mitigating circumstance the jury’s punishment recommendation. The trial court considered this evidence to be a nonstatutory mitigating circumstance entitled to moderate weight considering the jury’s vote, which in one case was 10 for life imprisonment without parole and 2 for death, and in two of the cases was 9 for life imprisonment without parole and 3 for death, and in the final case was 7 for life imprisonment without parole and 5 for death. The trial court cited several reasons for overriding the jury’s recommendation.
 

 In weighing the aggravating circumstances against the mitigating circumstances, the trial court accorded great weight to the aggravating circumstance of § 13A-5-49(5), Ala.Code 1975, noting that the officers were acting as agents of the court in their attempt to duly serve warrants, and that two of the three officers were gunned down from behind without any opportunity to draw their weapons. The trial court also placed great weight on the aggravating circumstance contained in § 13A-5-49(7), Ala. Code 1975, that the capital offense was committed to disrupt or hinder the lawful exercise of a government function. Stating in his amended sentencing order on return to second remand that “[i]f we are to have law and order in a civilized society, then officers like these, who were gunned down while trying to perform a government function or enforce the law must mean something.” The trial court further noted that Spencer showed no remorse in his statement to the police following the murders or in his testimony; rather, the trial court felt that Spencer seemed to indicate that he was justified in killing these officers. In his second amended sentencing order, the trial court stated: “This is the most brutal and violent attack on law enforcement officers this Court has seen in its combined thirty years as a prosecutor, defense lawyer, and as a judge.” The trial court’s findings concerning the aggravating and mitigating circumstances is supported by the record.
 

 It is the finding of this court that death is the proper sentence in this case. There
 
 *259
 
 is no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 18A-5-53(b)(2), Ala.Code 1975, requires this court to weigh the aggravating and mitigating circumstances independently to determine the propriety of the Spencer’s sentence of death. An independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. As required by § 13A-5-53(b)(3), Ala.Code 1975, this Court must determine whether Spencer’s sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. The sentence of death in this case is neither excessive nor disproportionate to the penalties imposed in similar cases, considering both the crime and Spencer. See, e.g.,
 
 Harris v. State,
 
 2 So.3d 880 (Ala.Crim.App.2007) (death penalty imposed upon conviction of capital murder for the killing of two or more persons pursuant to one course of conduct or a series of acts);
 
 Woods v. State,
 
 13 So.3d 1 (Ala.Crim.App.2007) (death penalty imposed upon conviction of capital murder in the shooting deaths of four Birmingham police officers);
 
 McNabb v. State,
 
 887 So.2d 929 (Ala.Crim.App.2001), aff'd 887 So.2d 998 (Ala.2004) (death penalty imposed upon conviction of capital murder for the killing of a Montgomery police officer).
 

 For the reasons expressed here, in our February 27, 2009, opinion, and in our April 4, 2008 opinion, we affirm Spencer’s convictions and sentences.
 

 The foregoing opinion was prepared by Retired Appellate Judge H.W. “Bucky” McMillan, while serving on active-duty status as a judge of this court under the provisions of § 12-18-10(e), Ala.Code 1975.
 

 AFFIRMED.
 

 WISE, P.J., and WELCH, WINDOM, and KELLUM, JJ., concur.
 

 [1]
 

 . Spencer also gave oral and written notice of appeal with regard to the attempted-murder conviction in case no. CC-04-4132.
 

 [2]
 

 . Officer Collins testified on cross-examination that although he did not recall verbatim what Officer Owen was saying to the individual, he saw the questions related to drug activity-
 

 [3]
 

 . Woods was also convicted of capital murder for his involvement in the shootings of the police officers and was sentenced to death for his convictions. His convictions and sentences were affirmed by this Court.
 
 Woods v. State,
 
 13 So.3d 1, opinion on return to remand, 13 So.3d at 40 (Ala.Crim.App.2007).
 

 [4]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [5]
 

 . We recognize that Spencer’s appellate counsel did not have the benefit of the Alabama Supreme Court’s opinion in
 
 Ex parte Johnson,
 
 which was not issued until October 6, 2006, several months after Spencer’s initial brief and reply brief were filed with this Court.
 

 [6]
 

 . Spencer also raised this claim in his motion for a new trial, but he did not present any additional evidence indicating that Cooper would have testified at trial, and he did not call Cooper to testify at the hearing on the motion for a new trial.
 

 [7]
 

 . The law on self-defense in effect at the time of the offense governs. See
 
 White v. State,
 
 992 So.2d 783 (Ala.Crim.App.2007).
 

 [1]
 

 . Spencer was convicted of one count of capital murder for the murder of each officer and one count because he killed two or more persons pursuant to one scheme or course of conduct, § 13A-5-40(a)(10), Ala.Code 1975.
 

 [2]
 

 . In CC-04-4131, the record indicates that the jury's recommendation was 9 for life without parole and 3 for death.